**GRATIOT COMMUNITY HOSPITAL,**
Petitioner/Cross–Respondent,

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent/Cross–Petitioner.**

Nos. 93–6533, 94–5023.

United States Court of Appeals, Sixth Circuit.

Argued Feb. 3, 1995.

Decided April 21, 1995.

---

Mark D. Nelson (argued and briefed), Catherine R. Giella (briefed), Keck, Mahin & Cate, Chicago, IL, for petitioner cross-respondent.

Aileen A. Armstrong, Deputy Associate Gen. Counsel (briefed), Frederick C. Havard (argued), Marilyn O'Rourke, N. L. R. B., Washington, DC, for respondent cross-petitioner.

Before: MERRITT, Chief Judge; BROWN and BATCHELDER, Circuit Judges.

BROWN, J., delivered the opinion of the court, in which MERRITT, C.J., joined. BATCHELDER, J. (pp. 1261–65), delivered a separate opinion dissenting in part and concurring in part.

BAILEY BROWN, Circuit Judge.

This case arose from various unfair labor charges filed against petitioner, Gratiot Community Hospital (the "Hospital"), by the Gratiot Community Hospital Registered Nurses Association, the labor organization representing the Hospital's registered nurses. The National Labor Relations Board (the "Board") issued a complaint against the Hospital alleging four violations of the National Labor Relations Act, 29 U.S.C. § 158 (the "Act"): (1) that the Hospital coerced an employee(s) to meet with members of management without the presence of a Union representative in order to discuss or attempt to resolve grievances; (2) that the Hospital unlawfully refused to bargain with the Union about the Hospital's decision to cease supplying surgical scrubs to employees; (3) that the Hospital unlawfully terminated the 7/70 shift program;[1] and (4) that the Hospital unlawfully terminated the position of nursing supervisor. An Administrative Law Judge ("ALJ") heard the matter and found against the Hospital on all four claims. The Board subsequently issued its decision and order, adopting the ALJ's decision in full. The Hospital now petitions this court to review two of the Board's four determinations: (1) that the Hospital unlawfully ceased to supply scrub uniforms to registered nurses, and (2) that the Hospital unlawfully terminated the 7/70 program by reducing the nursing staff teams to zero. The Board has filed a cross-petition seeking enforcement of its order. We order enforcement of the Board's order on the issue of surgical scrubs; however, we deny enforcement of the order with respect to the termination of the 7/70 staffing program. We also order enforcement on the two remaining issues not contested by the Hospital.

## I.

Gratiot Community Hospital is an acute health care facility located in Alma, Michigan. Since 1967, the Hospital's registered nurses have been represented by the Gratiot Community Hospital Registered Nurses Association (the "Union"). The Hospital and Union had a collective bargaining agreement ("CBA") covering all periods in question.

In the spring of 1991, the Hospital determined that it was sustaining severe financial losses. Deficits of several million dollars were reported for both 1990 and 1991, and a three million dollar loss was projected for 1992. Consequently, the Hospital initiated an intensive review of its operations in order to identify ways in which it could function more economically. The Hospital formed a "turnaround" task force to develop a recovery plan for the Hospital.

A series of meetings and communications took place during the summer of 1991. On June 26, management officials informed the Union Executive Committee and the Union's bargaining agent, Jim Hayes, about the Hospital's financial predicament, the existence of the turnaround team, and the fact that several cost-cutting steps would be necessary, including the likelihood of bargaining unit member layoffs. The parties met three more times on July 17, July 30, and August 5,

---

1. In 1981, as a means of attracting registered nurses to night shift assignments, the Hospital negotiated with and obtained the Union's consent to a new staffing procedure called the "7/70" program. The program provided that each member of a paired team would work a full seven-day, ten-hour, night-shift and receive 80 hours pay for 70 hours work, or 1.19 times more than the regular hourly rate.

discussing several issues and proposals.[2] The parties were unable, however, to accomplish anything substantial. In the meantime, the Hospital unilaterally initiated several cost-cutting measures germane to this appeal.

### 1. The Hospital abolished its scrub uniform policy.

For many years, the Hospital voluntarily purchased and laundered scrub uniforms for most of the Hospital staff, including the registered nurses. It had become a longstanding practice. However, on July 22, 1991, the Hospital issued a report to all employees announcing that "the Hospital will no longer furnish surgical scrub suits" to employees in most departments. A memo distributed on July 23, the next day, restated and expanded the Hospital's announcement, stating in pertinent part that:

Effective September 1, ... the Hospital will no longer supply employees with surgical scrubs as a replacement for uniforms. The policy change affects all departments....

Employees of departments who currently utilize scrubs will have the option of purchasing scrubs currently provided or purchase appropriate uniforms from outside vendors....

....

It will be the employees' responsibility to launder their own scrubs effective September 1....

Union President, Glenn King, testified that he never received formal notice from the Hospital of its decision to terminate the scrub policy prior to the above memo being posted on a Hospital bulletin board. Moreover, King alleged that management told the Union that the decision with respect to the scrub policy was non-negotiable. Members of management deny having taken that position.

### 2. The Hospital reduced the number of 7/70 staff teams to zero.

As stated, the 7/70 staffing program was negotiated by the Hospital and Union to attract registered nurses to the night-shift. The program began with just one team of nurses, and although there had been some fluctuation, the number of teams increased steadily. Prior to the adoption of the Hospital's financial recovery plan, there were thirteen teams.

Article 46 of the CBA states that "[t]he Director of Nursing will decide the number of assignments and the work areas that will be under the Seventy Hour Shift."[3] Relying on this language, the "turnaround" task force obtained the Board of Director's approval to reduce the number of 7/70 teams to zero. This inevitably led to some nurses being laid off or bumped to part-time positions thereby losing their health benefits. The hospital later determined that it needed to reinstate the 7/70 program, and invited bidding for placements in two teams.

### 3. The Board's Conclusions and Order.

The Board, in adopting the ALJ's rulings, held that the Hospital violated § 8(a)(5) and (1) of the Act by refusing to bargain with the Union over ceasing to supply scrub uniforms to all registered nurses, and by, without bargaining, terminating the 7/70 program by reducing the number of staff teams to zero. The Board ordered the Hospital to cease and desist from refusing to bargain with the Union about the scrub uniform and 7/70 matters, make any affected employees whole, and post a notice to all employees with respect to the matter. The Hospital contends that the Board's/ALJ's findings and conclusions with respect to these two issues are erroneous and not supported by the evidence in the record. The Board, on cross-appeal, seeks enforcement of its order.

---

**2.** For example, the Hospital explained that twenty-three full-time registered nurse positions would likely be eliminated. The Hospital indicated, however, that if the Union was willing to forego an earlier negotiated 8% wage increase, only eleven registered nurse positions would have to be eliminated. The Union countered that it could not forego the wage increase but would

consider a deferral of the pay raise to a later time. The Hospital rejected this counter-offer as well as other cost-cutting ideas of the Union.

**3.** The Director of Nursing is part of the Hospital's management.

## II.

■ According to the Act, "findings of the Board with respect to questions of fact if supported by substantial evidence on the record as a whole shall in like manner be conclusive." 29 U.S.C. § 160(e). Likewise, where substantial evidence supports the Board's conclusions, such conclusions may not be disturbed on appeal. *Kux Mfg. Co. v. NLRB,* 890 F.2d 804, 808 (6th Cir.1989). In fact, we are not permitted to displace the Board's choice between two conflicting views, even if we could justifiably reach a different conclusion reviewing the matter *de novo.* *YHA, Inc. v. NLRB,* 2 F.3d 168, 172 (6th Cir.1993); *Highland Superstores, Inc. v. NLRB,* 927 F.2d 918, 923 (6th Cir.1991). Evidence is considered substantial if it is adequate to a reasonable mind to uphold the decision. *Id.*

■ Section 8(a)(5) of the Act makes it an unfair labor practice for an employer "to refuse to bargain collectively with the representatives of his employees." 29 U.S.C. § 158(a)(5); *NLRB v. Centra, Inc.,* 954 F.2d 366 (6th Cir.1992), *cert. denied,* — U.S. ——, 115 S.Ct. 462, 130 L.Ed.2d 370 (1994). The duty to bargain collectively requires an employer and the union representing the employees to "meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment...." 29 U.S.C. § 158(d). Thus, an employer violates § 8(a)(5) by unilaterally changing any term or condition of employment subject to mandatory bargaining. There is no such violation, however, if the union has waived its right to bargain. *YHA, Inc. v. NLRB,* 2 F.3d 168, 172 (6th Cir.1993).

### 1. Whether the Hospital violated the Act by ceasing to supply surgical scrubs.

As stated, the Board/ALJ held that the Hospital violated the Act by refusing to bargain with the Union over ceasing to supply scrub uniforms to registered nurses. The ALJ first found, and the Hospital does not contest, that providing laundered scrubs to its employees became a condition or benefit of employment through longstanding past practice. Any change in this condition, therefore, was a mandatory subject of bargaining. Thus, the Hospital was required to give the Union notice of its intent to rescind the scrub uniform policy and a good-faith opportunity to bargain about it.

### A. Notice

■ In the Sixth Circuit, actual notice is sufficient to satisfy an employer's duty to notify union representatives of a change in conditions or terms of employment. *YHA, Inc.,* 2 F.3d at 173. Accordingly,·

> while "formal and full" notice may be prudent, if only to preclude another from claiming ignorance, it is not required.... "[W]here a union had actual notice of an employer's intentions at a time when there was sufficient opportunity to bargain prior to implementation of the change, the employer may not be faulted for failing to afford formal notification."

*Id.* (quoting *Medicenter, Mid-South Hosp.,* 221 N.L.R.B. 670, 678, 1975 WL 6475 (1975)).

■ In our case, the Hospital notified its employees, in writing on two occasions, that its practice of supplying laundered scrubs was being terminated. The registered nurses, therefore, including those on the Union Executive Committee, were informed that scrubs would no longer be provided. Consequently, we conclude that, although the Union did not receive formal notice of the change in scrub policy, it nevertheless received actual notice sufficient to satisfy the Hospital's duty to notify.

### B. Fait Accompli

The Hospital contends that because the Union received notice of the revised scrub policy, and because the Union failed to "promptly request that the employer bargain over the matter," the Union waived its right to bargain. *See YHA, Inc.,* 2 F.3d at 173. The Hospital points out that the Union had knowledge of the Hospital's intent to change the scrub policy on July 22–23, the dates the letters were sent out, and roughly five weeks prior to when the planned action would go into effect on September 1.

■ With respect to waiver, a union may waive its statutory right to bargain, but such waiver must be clear and unmistakable. *Centra, Inc.,* 954 F.2d at 371.

> Waiver will be found if the evidence shows that the Union received sufficient notice of the proposed change, and yet failed to protest or demand bargaining on the issue. The Board requires proof of clear and unequivocal notice such that Union's subsequent failure to demand bargaining constitutes a "conscious relinquishment" of the right to bargain.

*YHA, Inc.,* 2 F.3d at 173.

■ The ALJ concluded, however, that even if the letters were sufficient to confer actual notice to the Union of the revised scrub policy, the Hospital did not intend to enter into good-faith bargaining, and therefore, the Union could not have waived its bargaining rights. "If a policy is implemented too quickly after notice is given, *or an employer has no intention of changing its mind,* the notice constitutes nothing more than informing the union of a *fait accompli.*" *Centra, Inc.,* 954 F.2d at 372 (emphasis added) (citations omitted). "Notice of a *fait accompli* is simply not the sort of timely notice upon which the waiver defense is predicated." *Id.* (citations omitted).

In the instant case, there is substantial evidence in the record to support the Board's decision. In each of the communications to the employees, the scrub policy change was stated in definite terms. The Hospital's first letter stated that it would "no longer furnish surgical scrub suits. . . ." Moreover, the second communication stated that "the policy . . . . has changed" and the change "affects all departments." Given the language of these communications, the Union was left with the impression that the Hospital was not willing to enter into good-faith bargaining. The ALJ stated that "[n]either of these communication[s] suggests that the notice was of a tentative or preliminary proposal. Rather, each was a pronouncement of a final and unqualified decision."

Furthermore, the Hospital bypassed the Union and its representatives by communicating directly with the employees. The ALJ noted that this form of direct communi-

cation sent "a strong signal that the [Union] had no effective role to play in [the Hospital's] pre-determined process." The ALJ also noted that when the Union did attempt to raise the scrub policy change, it was conveyed to the Union that the issue was "nonnegotiable." According to the ALJ, therefore, the decision was already "cast in stone" and any request by the Union would have been futile.

Because notice of the new scrub policy to the Union amounted to a *fait accompli,* the Union did not forego an opportunity to bargain on the scrub issue. Essentially, the Hospital did not, in good faith, give the Union an opportunity to bargain. Consequently, we find that substantial evidence supports the ALJ's determination that the unilateral termination of the scrub policy was an unfair labor practice.

### 2. Whether the Hospital violated the Act by reducing the number of 7/70 staff teams to zero.

■ The Union contended, and the Board/ALJ concluded, that when the Hospital reduced the number of 7/70 teams to zero, without notifying or conferring with the Union, the Hospital unilaterally altered the wages, hours and other conditions of employment of bargaining unit members in violation of the Act. For example, because nurses who had elected the 7/70 shift worked only 70 hours for 80 hours pay, the elimination of the program increased the number of hours worked without a commensurate increase in wages.

The Hospital contends, however, that its decision to reduce the number of 7/70 teams to zero was clearly within its express rights under the CBA. The primary provision upon which the Hospital relies, Article 46, § 1, provides:

> Assignments to the Seventy Hour Shift will be made by the Director of Nursing in cooperation with the employees involved. The Director of Nursing will decide the number of assignments and the work areas that will be under the Seventy Hour Shift. . . .

The Hospital argues, therefore, that it had discretion to reduce the 7/70 nursing teams to zero, and its decision to do so was a specifically reserved right under the CBA.

 When an employer and union bargain about a subject and memorialize that bargain in a collective bargaining agreement, they create a set of rules that govern their future relations. Unless the parties agree otherwise, there is no continuous duty to bargain with respect to a matter covered by the contract. Thus, we are bound to enforce lawful labor agreements as written. *See NLRB v. United States Postal Serv.*, 8 F.3d 832, 836 (D.C.Cir.1993).

 On the other hand, an employer commits an unfair labor practice if, without bargaining to impasse, it effects a unilateral change of an existing term or condition of employment. *NLRB v. Katz*, 369 U.S. 736, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962). Thus, our issue becomes whether the Hospital acted pursuant to a right under the CBA, or rather, whether the Hospital attempted an unlawful unilateral modification. The Board's interpretation of contract terms is subject to *de novo* review. *Litton Fin. Printing Div. v. NLRB*, 501 U.S. 190, 201–03, 111 S.Ct. 2215, 2223, 115 L.Ed.2d 177 (1991).

The ALJ in the instant case found that the 'reduction to zero' decision was, in essence, an elimination of the program which consequently resulted in mass layoffs and altered wages, hours, and conditions of employment for bargaining unit members. The ALJ concluded that, although Article 46 permits hospital management to determine the specific number of nurses assigned to the 7/70 program, it neither states nor implies that management may unilaterally abolish the program altogether.[4] We disagree. Rather, we agree with the Hospital that elimination of the special shift program was clearly within

the Hospital's authority. The language of Article 46 is clear and unambiguous in granting authority to the Hospital to determine the number of shifts, including zero, in the 7/70 program.[5] Consequently, the Hospital's actions with respect to the 7/70 shift program were not in violation of the Act.

### III.

For the foregoing reasons, we DENY enforcement of the Board's order on the issue of the Hospital's termination of the 7/70 staffing program. As to all other determinations, the Board's order shall be ENFORCED.

ALICE M. BATCHELDER, Circuit Judge, dissenting in part, concurring in part.

I agree with the majority that Gratiot Community Hospital (the "Hospital") did not violate the NLRA by eliminating the 7/70 shift program. It is also my opinion, however, that the Hospital did not violate the NLRA by discontinuing the provision of laundered surgical scrubs to its employees. For the reasons that follow, therefore, I must respectfully dissent from the majority holding that the Hospital's announcement of the new surgical scrub policy was a fait accompli.

### I.

### A.

I agree with the majority that the Hospital provided the RNA with actual notice of the proposed change in the scrub policy. However, I cannot agree with the majority's view that the Hospital was unwilling to enter into good faith negotiations on that issue and that the Hospital's notice of the proposed change in scrub policy was notice to the RNA of a fait accompli. On the contrary, it is my opinion that substantial record evidence does not exist to support the decision of the ALJ

---

4. The Board/ALJ recognized that the Hospital reinstated the 7/70 program some time later. However, it found that when the Hospital announced that the shift would be abolished, it gave no indication that it might be restored. The Board/ALJ, therefore, considered the reinstatement a separate, unilateral act which did not affect its decision here.

5. What if, for example, the Hospital had reduced the number of 7/70 teams to one rather than zero. It seems to this court that such a decision would, even under the Board/ALJ's reasoning, be authorized under Article 46, although there would be a significant impact on the employment conditions of the 7/70 nurses.

and the Board that the Hospital's notice was a fait accompli.

The majority points to some of the language used by the Hospital in announcing the proposed change in scrub policy as evidence that the policy was a fait accompli. When that language is scrutinized in isolation and out of context, it could appear to state the new scrub policy in definite, inflexible terms. However, the Hospital issued two written communications to apprise the employees of the plan being proposed by the Hospital's "turnaround taskforce." When those communications are examined in their entirety, it is apparent that the change in policy was a proposal only, not a done deal. Both communications were part of the ongoing efforts of the turnaround taskforce to formulate an economic recovery plan, and it is clear from the record that when those communications were issued, the proposed plan had yet to be submitted to the Hospital Board of Directors for approval. The first communication was the Hospital president's report of July 22, 1991. This report's introduction stated:

> We must still present an acceptable plan for appropriate internal and external organization approval. We must still put the plan into action. We should be confident that working together we will be successful in achieving the hospital's financial turnaround and recovery.

After this introduction, the report listed numerous changes, including the new scrub policy, proposed by the taskforce to reduce Hospital costs. The president's report was followed on July 23, 1991, by a memorandum specifically directed to the cost-reduction plan's new scrub policy, which was to be implemented on September 1, 1991. Inadvertently, even the ALJ acknowledged that the proposal was not definite until it was approved by the Hospital Board. As the ALJ said: "at no time did any Hospital official divulge the specific recommendations of the recovery plan until it was adopted by the Board of Directors on August 7." Taken as a whole, it is unreasonable to infer from these communications that the Hospital was not willing to negotiate on any of the changes proposed.

The case at hand is factually very different from other cases in which an employer's actions represented a fait accompli. Here the Hospital's proposal did not go into effect until well after the RNA had been notified. *See, e.g., Intermountain Rural Elec. Ass'n v. NLRB*, 984 F.2d 1562 (10th Cir.1993) (finding of fait accompli because employer had implemented unilateral change in policy before union received notice of change); *Teamsters Local Union No. 171 v. NLRB*, 863 F.2d 946 (D.C.Cir.1988) (same), *cert. denied sub nom. A.G. Boone Co. v. NLRB*, 490 U.S. 1065, 109 S.Ct. 2063, 104 L.Ed.2d 628 (1989); *Soule Glass and Glazing Co. v. NLRB*, 652 F.2d 1055 (1st Cir.1981) (same). Rather, the Hospital's proposed policy was circulated approximately five weeks before the date projected for its implementation. *Cf. Gulf States Mfg., Inc. v. NLRB*, 704 F.2d 1390 (5th Cir.1983) (finding of fait accompli because union learned of layoffs only fifteen minutes before they were announced). Nor did Hospital management act secretly or fail to consult or inform the RNA of the proposed scrub change. *See, e.g., NLRB v. Centra, Inc.*, 954 F.2d 366, 372 (6th Cir.1992) (finding that employer implemented its plan secretly and failed to inform union until too late to bargain), *cert. denied,* —— U.S. ——, 115 S.Ct. 462, 130 L.Ed.2d 370 (1994).

Nevertheless, the ALJ held that the Hospital's communications were "pronouncement[s] of a final and unqualified decision." The ALJ based her conclusion solely on one small portion of the Hospital's communications and the fact that the Hospital "bypassed" the RNA by communicating directly with the employees. This is not substantial evidence that the Hospital was notifying the RNA of a fait accompli. First, as this Court has concluded, the communications to the employees provided the RNA with actual notice of the new scrub proposal. Second, the language of the communications alone is not substantial evidence of a so-called fait accompli.

Finally, the Hospital is correct in its contention that the language of an employer's proposed policy is not required to be phrased in an open-ended manner. The case at hand is factually very similar to *YHA, Inc. v.*

*NLRB,* 2 F.3d 168 (6th Cir.1993), in which the company's Board of Trustees adopted a resolution that all company facilities were to become smoke free within three months of adoption of the resolution. *YHA,* 2 F.3d at 170. Although the employer in *YHA* informed the employees that "the facilities would be smoke free by April 1, 1990," the *YHA* court did not find the policy to be a fait accompli. *Id.* at 170. On the contrary, the *YHA* court found that the union had waived its right to bargain by failing to make a timely bargaining demand. *Id.* at 173. In *YHA,* therefore, the company first made a decision to establish the new policy unilaterally, then announced the new policy—in definite terms—to its employees, and finally met with its employees to best implement the policy. In the case at hand, the policy change had not yet even been adopted by the Hospital Board of Directors. The new scrub policy was therefore even less definite than the policy proposed by the employer in *YHA.* At any rate, the language of the Hospital's proposed policy is not enough to constitute substantial evidence that the change was already a fait accompli.

If the Hospital's notice of its proposed policy change was not notice of a fait accompli, the RNA has the duty to prove that it did not waive its right to bargain. It was the RNA's duty to "act with due diligence in requesting bargaining." *YHA,* 2 F.3d at 173. According to the *YHA* court:

> [W]here an employer has made a decision and announced it to the employees in a similar time period before its effective date, the Board has found the bargaining representative must do more than merely protest the change; *it must meet its obligation to request bargaining.* As those cases hold, *any less diligence amounts to a waiver* by the bargaining representative of its right to bargain.

*Id.* (emphasis added) (footnotes omitted) (quoting *Jim Walter Resources, Inc.,* 289 N.L.R.B. 1441, 1442, 1988 WL 213953 (1988)).

According to the RNA, it did raise the issue of the scrub policy at meetings with Hospital management. The ALJ agreed with the RNA, stating that "I am convinced that the Union would not neglect to raise [the scrub] issue while it was engaged in discussions with the Respondent about other elements of the recovery plan." The ALJ does not make it clear, however, what convinced her that the union actually brought up the issue. The ALJ only concludes that the RNA would "surely" not have added the issue of the scrub policy to their amended complaint as early as August 20 unless they believed that the hospital was not willing to bargain in good faith.

Once again, however, substantial record evidence does not exist to support the ALJ's finding. The RNA cites to two portions of the transcript to support its claim that union representatives did raise the issue in meetings with the hospital. Neither example in the transcript provides substantial evidence that the union *requested negotiation* on this issue. One union witness, James Hayes, the RNA's bargaining agent, testified that the subject was broached, but his testimony is not as conclusive as the RNA would suggest. Mr. Hayes testified to the following:

Q. All right. Now you mentioned that there was some talk about [the past practice of providing scrubs] at one meeting sometime in July or early August, right?

A. Uh-huh.

Q. Do you recall the specifics of that discussion regarding scrubs? You said the RNA brought it up.

A. Well I had been told by the membership and the executive committee not to do anything that would open the contract for negotiations, they were fearful about the wage increase which had been negotiated. And so in the sense of negotiations, *I don't know that it ever occurred.* But we always said that we would be willing to talk about those issues. But the Hospital didn't really talk to us in the few meetings that occurred, they told us what they wanted and then did not respond to our response.

(emphasis added). Glenn King, an RN at the hospital and President of the Executive Committee of the RNA, was also asked if the

scrub policy change came up in any of the meetings. King testified as follows:

Q. What, if anything, did you do as Local President or the RNA President, when you discovered this change in [scrub] policy? Did you go to Management?

A. Well, we found these, these changes, I think we already were involved in the lay off and this was just another thing added to that.

Q. When you say you were already ...

A. Discussions.

. . . .

Q. And did you bring this up in, to Management, saying what's going on here?

A. It was mentioned, like I say, with everything else involved.

Q. What was ...

A. *Not specifically.*

. . . .

Q. When you discovered, though, that they had made this decision you asked them about it, is that correct? You asked who about it?

A. *We would have asked* Carol Goffnett and Dennis Witham.

Q. And you said, what did you ask them, do you recall?

A. Again, *we would have just asked* their position on the scrubs. Again, we were told, non-negotiable, so we added that to our unfair labor practice.

(emphasis added).

It is my opinion that substantial evidence does not support the ALJ's finding. In fact, evidence in the record proves to the contrary that the RNA failed to raise the scrub issue in any meeting. This evidence is found in an August 3rd RNA memorandum to the hospital in which the RNA requested a special conference "to discuss an attempt to resolve all issues." This RNA memo listed five issues to be discussed, and the change in policy regarding scrubs was *not* included among those issues. It is clear from the record that the RNA waived its right to bargain on the scrub policy by failing to raise the issue of scrubs and failing to request an opportunity to bargain.

**B.**

Finally, even if there were substantial evidence to support the findings of the ALJ and the Board, it is unreasonable to require the Hospital to negotiate on an issue when the union representatives maintain the position that they are only present to "listen." The duty to bargain in good faith is a mutual obligation among all parties to the negotiations. *Wald Mfg. Co. v. NLRB*, 426 F.2d 1328, 1331 (6th Cir.1970); *see also Pease Co. v. NLRB*, 666 F.2d 1044, 1049 (6th Cir.1981), *cert. denied sub nom. Ohio Valley Carpenters Dist. Council v. Pease Co.*, 456 U.S. 974, 102 S.Ct. 2238, 72 L.Ed.2d 848 (1982); *Seattle–First Nat'l Bank v. NLRB*, 638 F.2d 1221, 1227 n. 9 (9th Cir.1981) ("[W]hat is required is that both parties 'enter into discussions with an open and fair mind, and a sincere purpose to find a basis of agreement ....'") (quoting *NLRB v. Holmes Tuttle Broadway Ford, Inc.*, 465 F.2d 717, 719 (9th Cir.1972)). Consequently, " 'bargaining is a two-sided proposition; it does not exist unless both parties enter the negotiations in a good faith effort to reach a satisfactory agreement.'" *Wald Mfg. Co.*, 426 F.2d at 1331 (quoting *NLRB v. Kentucky Utilities Co.*, 182 F.2d 810, 813 (6th Cir.1950)).

In this case, the RNA representatives expressly told Hospital management that they were not meeting with the Hospital to negotiate.[1] Clearly the RNA had no intention to bargain on the scrub issue. The requisite "common willingness" among the parties was not present in the case at hand. *NLRB v. Kentucky Utils. Co.*, 182 F.2d at 813. Consequently, I do not believe that the Hospital

---

**1.** It was apparent that the RNA did not intend to enter negotiations with the Hospital. In RNA Executive Committee President, Glenn King's own words:

I think we made it clear from the beginning of every meeting that we were not there to negotiate. We were there to listen.

According to James Hayes, the RNA's bargaining representative:

Well I had been told by the membership and the executive committee not to do anything that would open the contract for negotiations, they were fearful about the wage increase which had been negotiated.

can be held to have violated its duty to bargain in good faith.

## II.

Based on the foregoing, I concur in the majority's opinion to the extent it finds that the Hospital did not violate the NLRA by eliminating the 7/70 shift program. I must dissent, however, on the issue of the Hospital's implementation of a new scrub policy because it is my opinion that not only did the union waive its right to bargain on that issue, it had no intention of bargaining on the issue.