**"AUTOMATIC" SPRINKLER CORPORATION OF AMERICA and Figgie International Inc., Petitioners/Cross–Respondents,**

**v.**

**NATIONAL LABOR RELATIONS BOARD, Respondent/Cross–Petitioner,**

**Road Sprinkler Fitters Local Union No. 669, U.A., AFL–CIO, Intervenor.**

Nos. 95–6599, 96–5159.

United States Court of Appeals, Sixth Circuit.

Argued Dec. 5, 1996.

Decided July 29, 1997.

---

**5.** The district court did not define what those "future obligations" were.

Donald F. Woodcock (argued and briefed), Todd F. Palmer (briefed), Calfee, Halter & Griswold, Cleveland, OH, for Petitioners/Cross–Respondents.

David Seid (argued and briefed), National Labor Relations Board, Office of the General Counsel, Aileen A. Armstrong, Deputy Associate General Counsel, Peter Winkler (briefed), National Labor Relations Board, Appellate Court Branch, Washington, DC, for Respondent/Cross–Petitioner.

William W. Osborne, Jr. (argued and briefed), Osborne Law Offices, Washington, DC, for Intervenor.

Before: WELLFORD, RYAN, and SILER, Circuit Judges.

SILER, J., delivered the opinion of the court, in which WELLFORD, J., joined. RYAN, J. (pp. 621–23), delivered a separate opinion concurring in part and dissenting in part.

## OPINION

SILER, Circuit Judge.

Figgie International Inc. ("Figgie") and "Automatic" Sprinkler Corporation of America ("Automatic"), a division of Figgie (collectively, "Petitioners"), petition this court to

review the Decision and Order by the National Labor Relations Board ("NLRB" or "the Board") finding that Petitioners violated section 8(a)(1), (5), and (3) of the National Labor Relations Act ("the Act"), 29 U.S.C. § 158(a)(1), (5), and (3), by subcontracting bargaining unit work and discriminatorily laying off their employees represented by the unions and by refusing to bargain with the unions that had bargaining status over the decision to subcontract unit work as well as over successor collective bargaining agreements. The NLRB filed a cross-application for enforcement of its Order, and Road Sprinkler Fitters Local Union No. 699 ("Local 699") intervened in this action on the side of the NLRB. For reasons stated herein, we will **VACATE** the Order of the Board and **DENY** its enforcement.

## I.

Automatic is engaged in the design, fabrication, and installation of automatic fire protection systems. For many years it employed members of Local 669 as well as members of eleven other urban autonomous unions—namely Local 120, Local 281, Local 314, Local 483, Local 536, Local 542, Local 676, Local 692, Local 696, Local 699, and Local 709—to install these systems.[1] Through its membership in a multi-employer association of sprinkler installation contractors, the National Fire Sprinkler Association ("NFSA"), Automatic had successive collective bargaining agreements with the unions for many years. The expiration dates of the agreements ranged from July 31, 1993 to June 30, 1995. With the exception of Automatic's agreement with Local 483, all of the collective bargaining agreements contained a provision permitting subcontracting of work to employers who were signatories to the respective local agreements.

In recent years, Automatic had been experiencing financial difficulties. Each year officers and representatives of Figgie and Automatic held meetings to review past company performances and plan for the future. The annual meetings resulted in "hardcore" plans, which are five-year budget projection plans that were modified, updated, and extended yearly. At the annual meeting held in November 1992, the officers and representatives agreed to a plan (the "Neutral Plan"), in which Automatic would become a general contractor and would subcontract out all sprinklerfitter work upon the expiration of its collective bargaining agreements with the unions by August 31, 1995.

The Neutral Plan was expected to result in various benefits, including: gaining control of labor costs; elimination of negotiations with unions and the cost of grievances; minimization of excessive labor costs on some contracts; reduction of administrative labor costs and vehicle costs; elimination of road tool costs; ability to bid both union and non-union projects; and entrance into the residential market.

Automatic withdrew its membership in NFSA by a letter dated February 10, 1993. On the following day, it sent letters to the local unions representing Automatic sprinklerfitters notifying them of the withdrawal. These letters did not mention the Neutral Plan. Automatic thereafter increased its subcontracting, but limited it to contractors that had collective bargaining agreements with the unions as required under its agreements with the unions.

On May 26, 1993, Automatic gave Local 483 and Local 709 notice of termination of the collective bargaining agreements effective August 1, 1993 and September 1, 1993, respectively, pursuant to the terms of the agreements. On January 28, 1994, Automatic notified the remaining unions of its intent not to renew the collective bargaining agreements and of its decision to fundamentally change the nature of its business by becoming a general contractor, whereby it would no longer employ persons represented by the unions in the installation, alteration, maintenance, repair and service of fire control systems. In each of the January 28 letters, Automatic assured the unions that it would negotiate with them in good faith concerning its business decision. The ensuing exchanges between Automatic and the unions

---

**1.** Local 699 and the other unions mentioned belong to the United Association of Journeymen and Apprentices of the Plumbing and Pipe Fitting Industry of the United States and Canada.

varied. The Board found that Automatic refused to negotiate successor bargaining agreements with any of the unions.

Between August 17, 1993 and May 12, 1994, Automatic met with many of the unions to discuss its subcontracting decision. By April 1, 1994, Automatic laid off all of its sprinklerfitter employees, and by June 30, 1994, it liquidated substantially all of its construction vehicles, tools, and equipment formerly used to perform labor work on its sprinkler installation operations. Since that time, Automatic has subcontracted virtually all of its labor work to entities that have signed current collective bargaining agreements with the unions.

Between August 1993 and May 1994, the unions filed unfair labor charges with the NLRB against Petitioners. After conducting a hearing on this matter, an Administrative Law Judge ("ALJ") found against Petitioners. On October 25, 1995, the Board affirmed the rulings, findings, and conclusions of the ALJ.

## II.

■ We accept the Board's factual findings if supported by substantial evidence on the record as a whole. 29 U.S.C. § 160(f); *YHA, Inc. v. NLRB*, 2 F.3d 168, 172 (6th Cir.1993). We also review the Board's application of law to particular facts under the substantial evidence standard, but review the Board's conclusions of law de novo. *NLRB v. Pentre Elec., Inc.*, 998 F.2d 363, 368 (6th Cir.1993). If the Board erred in determining the proper legal standard, we may refuse enforcement of the Board's order on the ground that it has no "reasonable basis in law." *Id.; NLRB v. Brown*, 380 U.S. 278, 291–92, 85 S.Ct. 980, 988–89, 13 L.Ed.2d 839 (1965) (requiring reviewing courts to set aside interpretations of the Act by the Board that are inconsistent with statutory mandate, frustrate congressional policy or rest on an erroneous legal foundation). We review de novo the Board's interpretation of contract terms. *Gratiot Community Hosp. v. NLRB*, 51 F.3d 1255, 1261 (6th Cir.1995).

■ In reviewing the Board's interpretation of the NLRA, we adhere to the standard of review established by *Holly Farms Corp. v. NLRB*, —— U.S. ——, 116 S.Ct. 1396, 134 L.Ed.2d 593 (1996). *NLRB v. Webcor Packaging, Inc.*, 118 F.3d 1115, 1119–20 (6th Cir. 1997).

> Under this standard, our first task is to determine "whether Congress has directly spoken to the precise question at issue." [*Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984).] If Congress has done so, we must give effect to its expression. *Id.* at 842–43, 104 S.Ct. at 2781–82. If not, however, "the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843, 104 S.Ct. at 2781. *Accord Holly Farms*, —— U.S. at ——, 116 S.Ct. at 1406.

*Webcor*, 118 F.3d at 1119–20 (footnote omitted.)

## III.

■ Under section 8(a)(5) of the Act, an employer commits an unfair labor practice by refusing to bargain collectively with its employees' representatives in good faith concerning "wages, hours, and other terms or conditions of employment." 29 U.S.C. § 158(a)(5). An employer violates section 8(a)(1) and (5) of the Act if it takes unilateral action regarding a mandatory subject of bargaining without first bargaining to impasse. *Taylor Warehouse Corp. v. NLRB*, 98 F.3d 892, 901 (6th Cir.1996).

■ An employer's decision to subcontract work is considered a statutory subject of collective bargaining when it involves "the replacement of employees in the existing bargaining unit with those of an independent contractor to do the same work under similar conditions of employment." *See Fibreboard Paper Prods. v. NLRB*, 379 U.S. 203, 215, 85 S.Ct. 398, 405, 13 L.Ed.2d 233 (1964). The Board found that Petitioners' subcontracting decision was a mandatory subject of bargaining because they in effect substituted the subcontractors' employees for their own. Petitioners contend, however, that because subcontracting was already a subject covered by the collective bargaining agreement, further bargaining on that subject was foreclos-

ed. We find, contrary to the arguments of the Board and the union intervenor, that Petitioners raised the issue of their contractual right to subcontract in their submission to the Board and that this important issue is before us on appeal. It is not subsumed by claims of anti-union motivation.

When an employer and union bargain about a subject and memorialize that bargain in a collective bargaining agreement, they create a set of rules that govern their future relations. Unless the parties agree otherwise, there is no continuous duty to bargain with respect to a matter covered by the contract. Thus, we are bound to enforce lawful labor agreements as written.

*Gratiot Community Hosp.*, 51 F.3d at 1261 (citing *NLRB v. United States Postal Serv.*, 8 F.3d 832, 836 (D.C.Cir.1993)). *See also United Mine Workers of Am. v. NLRB*, 879 F.2d 939, 942–44 (D.C.Cir.1989) (holding that provisions on subcontracting in collective bargaining agreement satisfied company's statutory duty to bargain over the subject of subcontracting).

▮ Here, Petitioners and the unions bargained over the subject of subcontracting and they memorialized that bargain in their respective collective bargaining agreements. This bargain permitted Petitioners to contract out work as long as it was to a contractor who had a collective bargaining agreement with the local union. Because the collective bargaining agreements contained no language providing for subsequent bargaining during the term of the agreements with respect to the subcontracting of work, the Board had no authority to compel Petitioners to bargain with the unions over that subject. *See United Mine Workers*, 879 F.2d at 943(" '[W]hile the Board has the authority to compel enforcement of terms of a negotiated agreement, it cannot compel enforcement of terms that are not contained in that agreement.' ")(quoting *Hyatt Management Corp. v. NLRB*, 817 F.2d 140, 143 (D.C.Cir.1987)) (citing *H.K. Porter Co. v. NLRB*, 397 U.S. 99, 102, 90 S.Ct. 821, 822, 25 L.Ed.2d 146 (1970)).

▮ The Board likewise lacked the authority to order Petitioners to reinstate the subcontracted operations that employees represented by the union formerly performed and to reinstate with back pay all employees who were terminated as a result of the permissible subcontracting. The Board is not authorized to " 'compel concessions or otherwise sit in judgment upon the substantive terms of collective bargaining agreements.' " *United Mine Workers*, 879 F.2d at 943 (quoting *H.K. Porter*, 397 U.S. at 106, 90 S.Ct. at 824); *see also United States Postal Serv.*, 8 F.3d at 836 (stating that a lawful agreement may not be abrogated by the Board or by the courts merely because one party is unhappy with a term of the contract).

In *Gratiot Community Hospital*, 51 F.3d at 1260, the Sixth Circuit considered the issue of whether a hospital violated section 8(a)(5) of the Act by failing to bargain with the union over the hospital's elimination of a staffing procedure called the "7/70" program by reducing the nursing staff teams to zero. The relevant provision in the collective bargaining agreement read as follows:

Assignments to the Seventy Hour Shift will be made by the Director of Nursing in cooperation with the employees involved. The Director of Nursing will decide the number of assignments and the work areas that will be under the Seventy Hour Shift. . . .

*Id.* Due to severe financial losses, the hospital unilaterally eliminated the 7/70 program as one of its several cost-cutting measures. *Id.* at 1257–58. As a result, some nurses were laid off or bumped to part-time positions, thereby losing their health benefits. *Id.* at 1258.

This court disagreed with the ALJ's conclusion that although the collective bargaining agreement permitted the hospital to determine the specific number of assignments to the 7/70 program, it neither stated nor implied that the hospital could unilaterally abolish the program altogether. *Id.* at 1261. Instead, we found that the actions by the hospital did not violate the Act because the language in the collective bargaining agreement clearly and unambiguously granted the hospital the authority to determine the num-

ber of shifts, including zero, in the 7/70 program. *Id.*

■ Similarly, the language in the collective bargaining agreements in the present case unambiguously granted Petitioners the authority to subcontract work, without limitation, provided it was to contractors that had agreements with the unions. During the term of the agreements, Petitioners restricted their subcontracting to union contractors.[2] As mentioned above, we are bound, as is the Board, to enforce the lawful labor agreements between Petitioners and the unions as written. By determining that Petitioners violated section 8(a)(5) by refusing to bargain with the unions concerning their decision to subcontract to union signatories during the term of the agreements, the Board has refused to give meaning and effect to the parties' contractual provisions concerning subcontracting. Such a determination frustrates one of the fundamental policies of the Act: the freedom of contract. *See United Mine Workers*, 879 F.2d at 943.

Furthermore, according to the ALJ, the "agreements were terminated." Neither the ALJ nor the Board determined that the agreements with the eight local unions that had section 9(a) bargaining status—Locals 669, 692, 536, 281, 314, 699, 483, and 709[3]— were ineffectively terminated either under the contracts' terms[4] or under the Act.[5]

■ Although when a collective bargaining agreement expires, an employer has

---

**2.** The unions maintained that Petitioners subcontracted during the terms of certain collective bargaining agreements with several nonunion subcontractors, but the ALJ found to the contrary where his decision shows that after Automatic withdrew its membership in NFSA, it "increased its subcontracting but apparently restricted it to union employers signatory to the union's collective bargaining agreements with NFSA" and that it "had carefully avoided any overt subcontracting to nonunion employers prior to its January 28, 1994 notice of intention to destroy all its union sprinklerfitter units as circumstances permitted, i.e., contract terminations." ALJ Decision (Dec. 30, 1994), *reprinted in "Automatic" Sprinkler Corp. of Am.*, 319 N.L.R.B. No. 57, 1995 WL 630836, at *4, *9, *25 (Oct. 25, 1995). These findings are not clearly erroneous.

**3.** As the Board noted, because Locals 120, 542, 676, and 696 maintained a section 8(f) relationship with Automatic, Automatic was permitted to repudiate that relationship upon expiration of the agreements. *See John Deklewa & Sons*, 282 NLRB 1375 (1987), *enforced sub nom. International Assn. of Bridge, Structural & Ornamental Iron Workers, Local 3 v. NLRB*, 843 F.2d 770 (3d Cir.), *cert. denied*, 488 U.S. 889, 109 S.Ct. 222, 102 L.Ed.2d 213 (1988).

**4.** Each agreement contains a "duration of agreement" provision along with provisions concerning the renewal of the agreement that can be interpreted as giving to either party the right to terminate the agreement provided certain notice requirements are met. Petitioners provided adequate and timely notice to each of the unions of their intent to terminate the collective bargaining agreements. *See New York News Inc. v. Newspaper Guild of New York*, 927 F.2d 82, 84 (2d Cir.1991) (upholding district court's determination that employer properly terminated collective bargaining agreement pursuant to its terms when it sent union written notice of termination after expiration of the agreement); *see also International Brotherhood of Elec. Workers, Local 26 v. AdVin Elec., Inc.*, 98 F.3d 161, 164–65 (4th Cir. 1996) (finding letters sent by employer to union indicating its desire to terminate the collective bargaining agreement upon its expiration effectively terminated agreement).

**5.** Section (8)(d) of the Act states:

[T]he duty to bargain collectively shall also mean that no party to [a collective bargaining] contract shall terminate . . . such contract unless the party desiring such termination . . .
(1) serves a written notice upon the other party to the contract of the proposed termination . . . sixty days prior to the expiration date thereof, . . .;
(2) offers to meet and confer with the other party for the purpose of negotiating a new contract . . .;
(3) notifies the Federal Mediation and Conciliation Service within thirty days after such notice of the existence of a dispute, and simultaneously therewith notifies [any similar state agencies]; and
(4) continues in full force and effect . . . all the terms and conditions of the existing contract for a period of sixty days after such notice is given or until the expiration date of such contract, whichever occurs later:

29 U.S.C. § 158(d)(1)–(4). Petitioners served timely written notice upon each union of the proposed termination, and they also offered to meet and confer with the unions, although apparently not for the purpose of negotiating a new contract. Additionally, Petitioners complied with the fourth requirement. Subcontracting was limited to union signatories during the term of the agreements and the Plan did not call for the contracting out of work until after the agreements were terminated. The record does not mention whether notification was given to the Federal Mediation and Conciliation Service.

a continuing duty to bargain in good faith and maintain the *status quo* as to conditions of employment in the expired agreement, *see Alaska Trowel Trades Pension Fund v. Lopshire,* 103 F.3d 881, 883 (9th Cir.1996), it has no such absolute duty at the agreement's termination. *Cf. Derrico v. Sheehan Emergency Hosp.,* 844 F.2d 22, 26–27 (2d Cir.1988) ("Rights and duties under a collective bargaining agreement do not otherwise survive the contract's termination at an agreed expiration date.") Thus, when the collective bargaining agreements between Petitioners and the unions with section 9(a) bargaining status terminated, rather than merely expired, upon their respective expiration dates, and because the agreements did not provide otherwise, Petitioners were relinquished of any contractual or statutory obligations to the unions. They cannot now be forced to negotiate new agreements with the unions or be prohibited from engaging in nonunion subcontracting. As the Supreme Court has stated, "The act does not compel agreements between employers and employees. It does not compel any agreement whatever. It does not prevent the employer 'from refusing to make a collective contract or hiring individuals on whatever terms' the employer 'may by unilateral action determine.'" *NLRB v. Jones & Laughlin Steel Corp.,* 301 U.S. 1, 45, 57 S.Ct. 615, 628, 81 L.Ed. 893 (1937).

The Board relies principally upon *Fibreboard Paper Products Corp. v. NLRB,* 379 U.S. 203, 85 S.Ct. 398, 13 L.Ed.2d 233 (1964), for its position. That case involved an employer's decision which did not change its basic operations. The employer simply decided, *inside its plant,* to subcontract out its maintenance work to save costs. There was *nothing in the collective bargaining agreement* about the employer's right to subcontract. There was no intimation whether the subcontract was, or was not, a union company. These facts and distinctions clearly make *Fibreboard* distinguishable from those of the instant case. The narrow question was whether mandatory bargaining on this "type of subcontracting out decision" was indicated; the decision did "not encompass other forms of 'contracting out' or 'subcontracting.'" *Id.* at 215, 85 S.Ct. at 405.

The Company's decision to contract out the maintenance work did not alter the Company's basic operation. The maintenance work still had to be performed in the plant. No capital investment was contemplated; the Company merely replaced existing employees with those of an independent contractor to do the same work under similar conditions of employment.

*Id.* at 213, 85 S.Ct. at 404.

As put by Justice Stewart in his concurring opinion in *Fibreboard,* the question of whether an employer fulfilled its duty to bargain over its subcontracting decisions "goes to the scope of the employer's duty in the absence of a collective bargaining agreement." *Id.* at 219, 85 S.Ct. at 407 (Stewart, J., concurring). In our case, of course, there was a collective bargaining agreement hammered out by the parties, expressly setting out the employer's right to subcontract.

The later Supreme Court authority, *First National Maintenance Corp. v. NLRB,* 452 U.S. 666, 101 S.Ct. 2573, 69 L.Ed.2d 318 (1981), is more pertinent to our case. In the latter case, the employer's decision involved "a change in the scope and direction of the enterprise ... akin to the decision whether to be in business at all." *Id.* at 677, 101 S.Ct. at 2580. The Court determined in that case that the employer's decision to cut back and terminate certain union employees, a partial layoff, was not an unfair labor practice under the circumstances.

We conclude that the harm likely to be done to an employer's need to operate freely in deciding whether to shut down part of its business purely for economic reasons outweighs the incremental benefit that might be gained through the union's participation in making the decision, and we hold that the decision itself is *not* part of § 8(d)'s "terms and conditions,".....

*Id.* at 686, 101 S.Ct. 2584 (footnotes omitted). To be sure, neither *Fibreboard* nor *First National* involved the case where, as here, the employer and the local unions had already bargained and provided for the specific right to subcontract or to layoff for economic reasons.

This court has pointed out the pertinent language from the Supreme Court decisions on this issue:

> Despite the importance of give and take between management and labor on many issues, Congress has required mandatory bargaining on matters concerning only " 'wages, hours, and other terms and conditions of employment.' " *First Nat'l,* 452 U.S. at 674, 101 S.Ct. at 2578 ... (quoting § 158(d)).

> . . . . .

> Congress did not intend to mandate bargaining over every conceivable issue arising between management and labor. "The National Labor Relations Act does not say that the employer and employees are bound to confer upon any subject which interests either of them; the specification of wages, hours, and other terms and conditions of employment defines a limited category of issues subject to compulsory bargaining." *Fibreboard Paper Prods. Corp. v. NLRB,* 379 U.S. 203, 220, 85 S.Ct. 398, 407, 13 L.Ed.2d 233 ... (1964) (Stewart, J., concurring).

*NLRB v. Plymouth Stamping Div., Eltec Corp.,* 870 F.2d 1112, 1115 (6th Cir.1989).

None of the cases cited by the Board involves a contractual right to subcontract, which is the distinguishable feature in this controversy. We believe the Board was in error in requiring the employer to renegotiate or bargain over a part of the agreed-upon collective bargaining agreement.

Accordingly, we refuse enforcement of the Board's Order on the issue of Petitioners' duty to bargain.

## IV.

Under section 8(a)(1) and (3) of the Act, it is an unfair labor practice for an employer "by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization." 29 U.S.C. § 158(a)(3).

■■■■ The initial burden of establishing a section 8(a)(3) violation is on the Board. *NLRB v. Kentucky May Coal Co.,* 89 F.3d 1235, 1241 (6th Cir.1996). Once the Board demonstrates that Petitioners' anti-union animus contributed to the employee's discharge, the burden shifts to the employer to prove by a preponderance of the evidence that there were independent, legitimate reasons for the decision and that the adverse action would have occurred in any event for those reasons. *Turnbull Cone Baking Co. of Tenn. v. NLRB,* 778 F.2d 292, 296 (6th Cir.1985), *cert. denied,* 476 U.S. 1159, 106 S.Ct. 2277, 90 L.Ed.2d 720 (1986).

The Board in the present case found the benefits expected to result from the Neutral Plan—gaining control of labor costs, eliminating labor negotiations, eliminating costs associated with union grievances, and allowing Automatic to become competitive against non-union contractors—to be direct evidence that Petitioners' actions of subcontracting unit work and discharging unit employees were motivated by anti-union animus. Petitioners also expected the Neutral Plan to result in the reduction of vehicle costs, the elimination of road tool costs, and entrance into the residential market. Those are legitimate reasons for the decision to adopt the Plan as is the desire to fundamentally change the nature of Automatic's base business from construction to service. In spite of that evidence, however, the ALJ found that Petitioners failed to carry the burden of proving by a preponderance of the evidence that the adverse action would have occurred in the absence of union representation of their employees.

■■■■ Regardless of whether Petitioners have met their burden, their actions were justified under the subcontracting provisions of the parties' collective bargaining agreement. Therefore, the Board's determination that Petitioners unlawfully discriminated against the unions by subcontracting in accordance with the terms of the collective bargaining agreement is legally erroneous. *See Ironton Publications, Inc. v. NLRB,* 73 F.3d 362 (Table), 1995 WL 758448, at *5, *6 (6th Cir. Dec.21, 1995) (unpublished) (holding legally erroneous a Board's determination that a company discriminated against an employee in violation of section 8(a)(1) and (3) of the Act when, after learning that he had

become a union member, the company began to pay the employee according to the terms of the collective bargaining agreement).

Therefore, we also deny enforcement of the Board's order on the issue of Petitioners' discrimination against the unions.

## V.

The Order of the Board is **VACATED** and the Board's petition to enforce its Order is **DENIED**.

RYAN, Circuit Judge, concurring in part and dissenting in part.

## I.

While I agree entirely with the conclusion reached in part III. of the majority opinion holding that the Board erred "in requiring the employer to renegotiate or bargain" over the employer's decision to subcontract installation, maintenance, and repair work, as permitted by the collective bargaining agreement, I do not agree with some of my brother's reasoning in reaching that conclusion. Specifically, I do not agree with the all-important statement in part III. of my brother's opinion:

> While parties have a continuing duty to bargain in good faith after the *expiration* of a collective bargaining agreement, there is no such duty at the agreement's *termination*. Thus, when the collective bargaining agreements between Petitioners and the unions with 9(a) bargaining status terminated, rather than merely expired, upon their respective expiration dates, and because the agreements did not provide otherwise, Petitioners were relinquished of any contractual or statutory obligations to the unions.

(Emphasis added.)

To me, there is no meaningful distinction between the "expiration" of the collective bargaining agreement and its "termination" *in the context of this case.* And, while there was no duty to bargain over "Automatic"'s decision to subcontract to unionized workers the maintenance, repair, and installation work it formerly did in-house, the absence of the duty arises from the terms of the collective bargaining agreement, and not from any supposed distinction between the "expiration" of the agreement and its "termination."

## II.

More importantly, I have serious disagreement with the analysis and the conclusion reached in part IV. of the majority opinion. In that part of the opinion, the majority rejects the conclusion of the NLRB that "Automatic" is guilty of a violation of section 8(a)(3) for having committed an unfair labor practice "by discriminat[ing] in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization." 29 U.S.C. § 158(a)(3).

In that conclusion, I think my colleagues are mistaken.

While I have considerable doubt that the NLRB correctly concluded that "Respondent violated section 8(a)(3) of the Act by subcontracting the unit work and *discriminatorily* laying off the unit employees," (emphasis added), I have no doubt whatever that this court has no authority to vacate that decision. It has none because our standard of review is whether there is substantial evidence in the record to support the finding that "Automatic"'s decision to subcontract its installation, maintenance, and repair work—a decision permitted by the collective bargaining agreement if not done discriminatorily—was, in fact, "motivated by antiunion animus" with the "ultimate intent" of ridding the company of a unionized workforce.

The ALJ reached that conclusion in the course of a 41–page, single-spaced written opinion which developed, in very considerable detail, the ALJ's basis for crediting the testimony of the union's witnesses, and discrediting the testimony of the employer's witnesses. And, while I have considerable doubt whether, had I been the statutorily designated fact finder, I would have made the credibility determinations the ALJ did, I have no doubt that, given his assessment of the credibility of the witnesses, there is substantial evidence justifying the conclusion that the employer's subcontracting decision was, in fact, discriminatory, and not, as the

ALJ put it, for the "pure as driven snow" reasons claimed by the employer.

There can be no question that "Automatic" did not commit an unfair labor practice under section 8(a)(3) simply by exercising its right guaranteed in the collective bargaining agreement to subcontract installation, repair, and maintenance work to unionized workers, and to eliminate that work in-house. Only if that action is taken with a "discriminatory intent," and for a purpose proscribed by section 8(a)(3), would the otherwise unassailable business decision become an unfair labor practice, and that, according to the ALJ and the Board, is precisely what happened. The otherwise neutral act of subcontracting, as permitted by the collective bargaining agreement, became an unfair labor practice, because it was, according to the ALJ, a carefully orchestrated, ill-concealed, two-stage program motivated, primarily, by union animus, and designed to rid the company of the financial burden of a unionized workforce. In support of that conclusion, the ALJ found, *inter alia:*

["Automatic" 's] conduct was motivated by antiunion animus and violated Section 8(3) of the Act with respect to *all* of the affected employees represented by *all* the Charging Unions, whether represented pursuant to a Sec. 9(a) or 8(f) arrangement.

Additionally,

Pro-Forma III–A in its first three pages is far more revealing concerning ["Automatic" 's] intentions. . . .

This change will provide us [ ("Automatic") ] the following benefits:

Gain control of labor costs on projects[;]

Minimizes the risk potential for labor cost overruns on contracts[;]

Not signatory to any union contract, its pay demands and its work rules[;]

Eliminate labor negotiations[;]

Eliminate costs associated with union grievances[;]

Further,

Pro Forma III–A clearly demonstrates ["Automatic" 's] dislike of the restrictions

imposed on it by union representation of its employees, and its desire to be a union-free employer. ["Automatic"] had contemplated the possibility of going nonunion for some time prior to its adoption of the "Neutral" plan, and after some misgivings, took the plunge. . . . ["Automatic"] went to considerable pains to mislead the unions into believing that it was merely extending its subcontracting.

Also,

["Automatic" 's president] advised the local unions representing ["Automatic"] sprinklerfitters of [the company's] withdrawal from NFSA, and sent the following message to [the company's] district managers:

. . . .

I need each of you to contact the Business Agent in your area and ask to sit down with them to discuss this change. . . .

Here is why we withdrew:

. . . .

*Union Relationship*—This will force us to work directly with the local unions for the benefit of both. We are not planning to be a non-union contractor. . . .

And,

["Automatic" 's] concealment commenced with its notice to NFSA that it intended to bargain individually with the Unions, continued with its reassurances to Simpson that there would be contractual relationships . . . in the future[.] . . . That announcement itself was designed to mislead the Unions. It invited bargaining on [the company's] decision to no longer employ the Locals' members, but the record clearly shows [the company] had no intention of bargaining on its decision.

And,

["Automatic" 's] primary concern was to increase its share of the fire protection market by being free from the unions' collective-bargaining agreements' restrictions on subcontracting which forbade [the company] to subcontract to nonunion firms, and, being thus freed, [the company] would penetrate the market share held by nonunion firms because it could then sub-

contract to the lowest bidder, union or nonunion.

Finally,

Respondent's conduct in terminating its union member employees, severing its relationships with the contracting unions, turning toward nonunion subcontracting, and concealing its ultimate plan from the Unions violated Section 8(a)(3) and (1) of the Act.

My brother's opinion does not take issue with these findings by the ALJ and their adoption by the Board. Nor does it assert that the Board erred in performing the burden-shifting analysis required in so-called "dual-motive" cases such as this. *Uforma/Shelby Business Forms, Inc. v. NLRB*, 111 F.3d 1284, 1291 (6th Cir.1997).

With regard to the required burden-shifting and "dual-motive" cases, the ALJ wrote:

> Furthermore, General Counsel has shown that the desire to rid itself of the Local Unions, thereby discouraging union activity, was at the very least one of the motivating factors in ["Automatic" 's] decision to become a general contractor and subcontract all its sprinkler installation work. ["Automatic"] therefore is obliged to show by a preponderance of the evidence it would have done so in the absence of union representation of its employees. *Wright Line*, 251 NLRB 1083 (1980); *NLRB v. Transportation Management Corp.*, 462 U.S. 393, 103 S.Ct. 2469, 76 L.Ed.2d 667 (1983). *Respondent has not carried this burden.*

(Emphasis added.) The ALJ expressly considered and rejected the proffered legitimate business reasons for "Automatic" 's decision. Nevertheless, my brother writes, "["Automatic" 's] actions were justified under the subcontracting provisions of the parties' collective bargaining agreement. Therefore, the Board's determination that Petitioners unlawfully discriminated against the unions by subcontracting in accordance with the terms of the collective bargaining agreement is legally erroneous." But that observation begs the question, which is, whether "Automatic" 's actions were, indeed, taken "under the subcontracting provisions of the parties' collective bargaining agreement" or were

taken for the forbidden discriminatory reason of anti-union animus aimed at simply ridding the employer of the financial burdens of a portion of its unionized workforce. The Board, in adopting the extensive analysis, findings, and conclusions of the ALJ, as well as the credibility determinations by the ALJ, found that the subcontracting decision was not taken "under the subcontracting provisions of the parties' collective bargaining agreement," but, given "Automatic" 's motive, was made in violation of section 8(a)(3).

### III.

For these reasons, I respectfully dissent from part IV. of my colleague's opinion and concur in the conclusion reached in part III.