NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

CENTRA, INC.; Central Transport, Inc.;
and Central Cartage Company,
Respondents.

No. 91–5236.

United States Court of Appeals,
Sixth Circuit.

Argued Oct. 28, 1991.

Decided Jan. 17, 1992.

Aileen A. Armstrong, Deputy Associate Gen. Counsel, Frederick Havard, Argued & Briefed, Howard E. Perlstein, David A. Fleischer, Judith A. Dowd, Washington, D.C., Frederick Calatrello, Director, N.L.R.B., Cleveland, Ohio, for petitioner.

Robert L. Duty, Timothy K. Carroll, Argued & Briefed, Dykema & Gossett, Detroit, Mich., for respondents.

Before RYAN and BOGGS, Circuit Judges, and GODBOLD, Senior Circuit Judge.*

RYAN, Circuit Judge.

The National Labor Relations Board seeks enforcement of its order issued against Centra, Inc. and its subsidiaries, Central Cartage Company ("Cartage") and Central Transport, Inc. ("Transport"), for violations of sections 8(a)(1) and (3), and 8(a)(1) and (5) of the National Labor Relations Act, 29 U.S.C. §§ 158(a)(1), (3), (5).[1] The order is reported at 299 N.L.R.B. No. 97. Centra, Cartage, and Transport have agreed, for purposes of this proceeding, to be treated as a single employer.

---

* The Honorable John C. Godbold, Senior Circuit Judge of the United States Court of Appeals for the Eleventh Circuit, sitting by designation.

1. Section 8(a)(1) of the NLRA makes it an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 [section 7]...." 29 U.S.C. § 158(a)(1). Section 7 protects the right of employees "to bargain collectively through representatives of their own choosing." 29 U.S.C. § 157. Specific violations of section 8(a)(3) or 8(a)(5) may also state derivative violations of section 8(a)(1). Cf. G. Heileman Brewing Co. v. NLRB, 879 F.2d 1526, 1533 (7th Cir.1989). Thus, we address only the substantive elements of sections 8(a)(3) and 8(a)(5).

For the reasons set forth below, the Board's application for enforcement is granted.

## I.

In the middle of 1982, Central Transport successfully bid on a contract with General Motors to break down, consolidate, and deliver freight in the Cleveland area. Central Cartage regularly did consolidation work, but Centra decided to perform this contract work through Central Transport. Transport leased a Cartage terminal for the GM consolidation work and, rather than employing Cartage workers, contracted with D & S Leasing Company to supply labor for the operation. D & S had already supplied drivers to Transport in Cleveland. Cartage dock workers in Cleveland were represented by Teamsters Local 407. The D & S employees, however, both drivers and dockworkers, were represented by Teamsters Local 507.

The employees performing GM consolidation work for Transport were on the payroll of D & S. Transport reimbursed D & S for its expenditures plus a percentage, fluctuating with the size of the payroll. Charles Garavaglia, then vice president for labor relations at Transport and Cartage, attended the initial contract negotiations between D & S and Local 507 in 1982, in order to identify acceptable economic terms of the contract and to stress Transport's need for flexible working hours to accommodate GM's "just in time" delivery requirements. The 1982 negotiations led to a so-called "white paper" agreement, differing from the Teamsters National Master Freight Agreement ("NMFA") with respect to the terms and conditions of employment. Later in 1982, Teamsters Local 964 replaced Local 507 as the bargaining representative of D & S employees.

In 1985, D & S and Local 964 negotiated a new agreement, effective June 1, 1985 through March 31, 1988. Attending the 1985 negotiations were George Rogers of D & S, Stephen Bridge of a multi-employer association representing D & S, and Andrew Suckart, a representative of the Ohio Conference of Teamsters. The 1985 nego-

tiations and agreement, unlike 1982, involved D & S employees working in other jurisdictions, specifically Teamsters Locals 20, 118, and 449, as well as 964. In 1985, the union sought a work preservation clause that would allow D & S employees to "follow the work" should Central Transport cancel its contract for labor with D & S, but the proposal was rejected by D & S as unacceptable to its client, Central Transport.

In February or March 1986, Centra officials determined that the GM consolidation work could be done for less money if performed by "new hires" employed under the auspices of Central Cartage and subject to the NMFA. The NMFA would apply to Cartage employees represented by Teamsters Local 407 and allowed for "new hire" wages approximately $2 less per hour than those paid to Local 964 members. Moreover, "new hires" formerly employed by D & S would lose seniority and health and welfare benefits which had accrued under the "white paper" agreement between D & S and Local 964. Garavaglia, then vice president for labor relations, testified that economics alone motivated the changeover to Cartage.

In early May 1986, Joe Goryl, a Centra official, asked Bruce Morrison, Cartage's terminal manager at the Cleveland dock, to prepare a list of D & S employees that Morrison felt should be hired by Cartage when it took over the GM consolidation work. Morrison listed 17 employees. He denied that union activity or support played a role in the selection of the employees and claimed to have picked only the "superstars" to continue on with Cartage. Jim Berquist, operations manager at the terminal, recommended five more D & S employees to be hired by Cartage, and Centra officials apparently chose four others. In all, 26 former D & S employees were ultimately hired by Cartage. Though the decision as to which D & S employees would be hired by Cartage was already made, short, perfunctory interviews were held with all employees.

On May 8, 1986, Goryl issued a memorandum to Cartage president Larry Thom-

as setting forth a four-week plan for the transition from D & S to Cartage. According to the memorandum, approximately 15 former D & S employees were to be employed at the new 45–man Cartage operation. Weeks one through three were to be used to conduct background checks on the 15 D & S candidates, hiring 5 dockmen per week. By week three, applicants for the other 30 positions were also to be hired "anonymously." To this end, an advertisement was published in the Cleveland *Plain Dealer* on May 15, 1986, seeking employees for Central Cartage's local operations.

Oswald Kelm, president of Teamsters Local 964 and bargaining representative of the D & S employees at the Cleveland dock, learned of the advertisement and telephoned Bruce Morrison to find out why Cartage was seeking dockmen. Morrison told Kelm that he knew nothing about the matter. Kelm sent a registered letter dated May 16, 1986 to Morrison, expressing the local's concerns about the advertisement and seeking clarification of its meaning to and effects on the members of Local 964.

Kelm's letter was never answered. Other testimony regarding the events of May 16, 1986 to June 2, 1986 is conflicting. Principally, the question before the Board was whether Local 964 was given notice of Centra's plan to terminate D & S and afforded an opportunity to bargain over that decision and the effects of the decision.

Kelm testified that neither Cartage's president, Larry Thomas, nor Richard Silverwood, who handled labor relations, responded to his phone calls. Kelm also testified that other discussions with terminal manager Bruce Morrison were uninformative, as Morrison continued to tell Kelm that he had no knowledge of the matter. According to Kelm, Silverwood returned his call only after the June 2 changeover to Cartage had already occurred. Silverwood had a different recollection of events. He testified to several telephone discussions with Kelm in May 1986, during which he informed the union president that Teamsters International officials had told the company to do away with personnel leasing

companies, or "flesh peddlers," that Cartage would be taking over the Cleveland dock operations and already had a contract with Teamsters Local 407, and that while D & S employees would be permitted to apply for positions with Cartage, the company would hire its own personnel for the job.

Silverwood also testified to a conversation in the week prior to the transition to Cartage with "Mr. Compo," another official with Local 964, after he had received word that Kelm had been assuring D & S employees that Cartage would hire the workers in seniority order. According to Silverwood, Compo was informed that Kelm had never been told that personnel would be hired in seniority order. Silverwood placed another call that day to Local 964 and again spoke to Compo, though Silverwood believed that Kelm was present during the conversation and aware of the information provided by Silverwood.

Based on the conflicting evidence presented, the ALJ found that Local 964 lacked adequate notice of Cartage's plans not to hire all of the D & S employees until at least May 28, 1986, based upon Kelm's assertions to the D & S employees regarding seniority hiring on that date, a letter from another union official on that date stating that he understood that former employees of D & S would become employees of Central Cartage, and the timing of telephone calls between Silverwood and Kelm.

Centra also asserts that Local 964 received notice of the changeover earlier than May 28 through conversations Silverwood had with Andrew Suckart, the representative of the Ohio Conference of Teamsters who negotiated the 1985 "white paper" agreement between D & S and several Teamsters local unions, and Robert Cassidy, the head of the Ohio Conference of Teamsters, at a Teamsters convention in Las Vegas during the week of May 19, 1986. In these conversations, Silverwood claims to have sought and gained assurances from Suckart and Cassidy that Cartage was not obligated to hire all of the D & S employees when it assumed control of the Cleveland dock operations. The ALJ and the Board determined that Local 964

was not placed on notice of Centra's plan by these conversations.

On May 31, 1986, the dockworkers were informed by Lawrence Koubeck, vice president of D & S, that they would have no job after that date unless Cartage called on them. One employee, Donald Gruszezynski, a former union steward, testified that Jim Bowen, a dock foreman, told him that Centra was trying to get rid of certain employees because of union activity. Another D & S employee, Kenneth Meyers, testified that dock foreman Wayne Gentry told him that he would not likely be called back because Bruce Morrison did not like union people. Meyers also stated that Joe Imondi, another dock foreman, told him that he and Archer Bailey III would not be back because they were with the union. Sherman Brown, a business agent for Teamsters Joint Council 41 and the Ohio Conference of Teamsters, testified to a breakfast meeting with Silverwood in early June 1986 where Silverwood allegedly told him that Centra had not taken back D & S employees in seniority order because they wanted to get rid of four or five of them who had high seniority status. The dock foremen each denied making these statements, as did Silverwood. The ALJ credited the testimony of Gruszezynski and Brown on these matters. He also credited Meyers as to the occurrence and substance of conversations with Joe Imondi, but credited Wayne Gentry's denial of any conversations with Meyers.

On June 2, 1986, Cartage opened for business with 26 former D & S employees and 24 outside workers, all paid according to the terms for new hires under the NMFA. Thirty-three employees of D & S were not recalled by Cartage.

The Board, in its August 31, 1990 order, determined that Centra violated sections 8(a)(1) and (5) of the NLRA by failing to bargain with Teamsters Local 964 over its decision or the effects of its decision to terminate an employee-leasing contract, to provide adequate notice to the union of the decision, or to provide the union with relevant information requested by the local president. The Board found that by the time Local 964 gained knowledge of Centra's plans not to hire all the D & S employees represented by the union, it had been effectively presented with a *fait accompli*. The section 8(a)(1) and (3) violations were based on a finding of antiunion animus and on the conclusion that the dismissal of and refusal to rehire 33 employees upon termination of the employee-leasing contract, the deceptive implementation of these actions and the refusal to bargain, were acts "inherently destructive" to the employees' section 7 rights under the NLRA.

## II.

Section 8(a)(5) of the NLRA makes it is an unfair labor practice for an employer "to refuse to bargain collectively with the representatives of his employees." 29 U.S.C. § 158(a)(5). The duty to bargain collectively requires an employer and the union representing its employees to "meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment...." 29 U.S.C. § 158(d). An employer's decision to contract work to employees outside the established bargaining unit is within the statutory scope of the "terms and conditions of employment" subject to mandatory collective bargaining. *See Fibreboard Corp. v. NLRB*, 379 U.S. 203, 210–13, 85 S.Ct. 398, 402–04, 13 L.Ed.2d 233 (1964). An employer violates section 8(a)(5) by unilaterally changing any term or condition of employment subject to mandatory bargaining. *First Nat'l Maintenance Corp. v. NLRB*, 452 U.S. 666, 674–75, 101 S.Ct. 2573, 2578–79, 69 L.Ed.2d 318 (1981). A joint employer is subject to the statutory duty to bargain under section 8(a)(5). *G. Heileman Brewing Co., Inc. v. NLRB*, 879 F.2d 1526, 1530 (7th Cir.1989).[2]

---

**2.** Whether a joint employer relationship exists depends upon "such factors as the supervision of the employees' day to day activities, authority to hire or fire employees, promulgation of work rules and conditions of employment, work as-signments, in issuance of operating instructions." *W.W. Grainger, Inc. v. NLRB*, 860 F.2d 244, 247 (7th Cir.1988). The Board's factual determination on this issue is entitled to summary affirmance as Centra has failed to chal-

Centra offers two arguments in opposition to the Board's determination that the company violated its duty to bargain with Local 964 over the decision to terminate its contract with D & S. First, Centra argues that Local 964 is estopped from asserting a joint employer relationship. Thus, Centra cannot be found to have violated section 8(a)(5), as the company had no duty to bargain with Local 964. Second, Centra argues that Local 964 waived its right to bargain.

■ In support of its estoppel claim, Centra relies on *Alaska Roughnecks & Drillers Ass'n v. NLRB*, 555 F.2d 732 (9th Cir.1977), *cert. denied*, 434 U.S. 1069, 98 S.Ct. 1250, 55 L.Ed.2d 771 (1978), to argue that because the union waited until after the leasing agreement was terminated to claim joint employer status and an obligation to bargain, it should be foreclosed from asserting such a relationship. We have reviewed the case and find it inapposite. *Alaska Roughnecks* was based upon a purported joint employer's right of due process to participate and be heard in a representation hearing before being required to bargain. No such concerns are present in this case. Moreover, other critical facts are different. Most importantly, the record makes clear that Local 964 had no reason to assert a joint employer relationship or a duty to bargain until it discovered what Centra's plans were. This information was carefully concealed from Local 964 officials, however, until it was too late to bargain over Centra's decision to terminate the D & S contract or, more importantly, the effects of that decision on members of Local 964.

■ With respect to waiver, a union may waive its statutory right to bargain, but such waiver must be clear and unmistakable. *Metropolitan Edison Co. v. NLRB*, 460 U.S. 693, 708, 103 S.Ct. 1467, 1477, 75 L.Ed.2d 387 (1983). The alleged waiver by Local 964 in this case is a factual issue. Thus, the findings of the Board must be

upheld so long as they are supported by substantial evidence on the record as a whole. 29 U.S.C. § 160(e); *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477, 71 S.Ct. 456, 459, 95 L.Ed. 456 (1951). Having carefully reviewed the record as a whole, we find that ample evidence supports the Board's conclusion that Local 964 did not waive its right to bargain over unilateral changes in the terms and conditions of employment.

To begin, Centra claims that it was clear that Local 964 received notice of the company's plans not to hire all of the D & S employees prior May 28, 1986, the date set forth by the Administrative Law Judge. The company relies primarily on Richard Silverwood's testimony to place the date earlier, although the ALJ specifically discredited that testimony. The ALJ's credibility determinations are entitled to great deference from this court. *NLRB v. Magnetics Int'l, Inc.*, 699 F.2d 806, 813 (6th Cir.1983). Centra offers this court no compelling reason to reject the ALJ's credibility determination in this matter.

Next, the company faults the ALJ and the Board for failing to find that adequate notice was given to the union on the basis of Silverwood's discussions with Andrew Suckart and Robert Cassidy of the Ohio Conference of Teamsters in Las Vegas during the week of May 19, 1986. However, as the record clearly shows, neither man could speak for Local 964. Suckart and Cassidy were officers of the Ohio Conference of Teamsters, not of Teamsters Local 964. They had neither actual nor apparent authority to bargain for Local 964 as to Centra's decision to terminate the D & S contract and to replace the union with Central Cartage employees under the jurisdiction of Teamsters Local 407. Obviously, they also therefore lacked the authority to waive Local 964's rights to bargain over the decision and its effects.

■ Finally, Centra asserts that it was open to changes in negotiations at any time

lenge the Board's order on the merits. Such a failure constitutes abandonment of the issue. *NLRB v. Tennessee Packers, Inc.*, 344 F.2d 948, 949 (6th Cir.1965). Moreover, we are satisfied

on a review of the whole record that substantial evidence supported the finding that Centra acted as a joint employer with D & S.

up until the changeover of June 2, 1986, and had Local 964 simply asked, the company would gladly have bargained over the decision. This assertion flatly conflicts with the findings that Centra had made its decision to terminate the D & S contract and to hire only certain D & S employees into its Cartage operations, implemented its plan secretly, and failed to consult Local 964 or to properly inform the union of its intention not to hire all of the D & S employees until it was too late to bargain. The Board's conclusion was well-founded on these facts. An employer must inform the union of its proposed actions under circumstances which at least afford a reasonable opportunity for counter arguments or proposals. *Gulf States Mfg., Inc. v. NLRB,* 704 F.2d 1390, 1397 (5th Cir.), *reh'g denied,* 715 F.2d 1020 (1983). If a policy is implemented too quickly after notice is given, or an employer has no intention of changing its mind, the notice constitutes nothing more than informing the union of a *fait accompli. Ciba–Geigy Pharmaceuticals Div.,* 264 N.L.R.B. 1013, 1017–18 (1982), *enforced,* 722 F.2d 1120, 1126 (3d Cir.1983). "Notice of a *fait accompli* is simply not the sort of timely notice upon which the waiver defense is predicated." *International Ladies' Garment Workers Union v. NLRB,* 463 F.2d 907, 919 (D.C.Cir.1972).

On review of the record as a whole, we find substantial evidence to support the Board's findings. The determination that Centra violated sections 8(a)(1) and (5) is therefore upheld.

### III.

Section 8(a)(3) of the NLRA makes it an unfair labor practice for an employer to discriminate against employees "in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization...." 29 U.S.C. § 158(a)(3). A violation of section 8(a)(3) normally requires a finding of antiunion animus. *NLRB v. Great Dane Trailers,* 388 U.S. 26, 33, 87 S.Ct. 1792, 1797, 18 L.Ed.2d 1027 (1967). Some conduct, however, is con-

sidered so "inherently destructive" of employee interests that it will be deemed to violate section 8(a)(3) without necessity of proof that it was motivated by an antiunion purpose. *Id.* Inherently destructive conduct carries with it "unavoidable consequences which the employer not only foresaw but which he must have intended." *NLRB v. Erie Resistor Corp.,* 373 U.S. 221, 228, 83 S.Ct. 1139, 1145, 10 L.Ed.2d 308 (1963). Therefore, such conduct bears "its own indicia of intent." *Id.* at 231, 83 S.Ct. at 1147.

In this case, the Board found that antiunion animus motivated Centra in its decisions as to whom to lay off and rehire upon the changeover from D & S to Cartage. Further, the Board determined that Centra's termination of the D & S contract, the transfer of consolidation work from Transport to Cartage in order to evade the terms of the 1985 "white paper" agreement between D & S and Local 964, and the company's covert acts taken to shirk its duty to bargain over the decision and its impact amounted to conduct inherently destructive of the section 7 rights of Local 964 members.

As to the inherently destructive finding, the Board concluded that Centra's conduct in terminating the contract with D & S without serving proper notice of its decision on Local 964 or allowing for meaningful negotiations about that decision and its effects, deceptively implementing a plan to continue operations at the Cleveland terminal under the auspices of Central Cartage, and treating former D & S employees as "new hires" under the NMFA violated section 8(a)(3). Those actions, the Board found, were "analogous to that of an employer that carries out a sham closing of a facility in order to reopen under new terms and conditions of employment more favorable to itself," and were inherently destructive to employees' section 7 rights to bargain collectively over the terms and conditions of employment and therefore violated section 8(a)(3).

While the Supreme Court has never precisely defined what constitutes "inherently destructive conduct," this concept re-

lates to conduct exhibiting hostility to the process of collective bargaining itself, not to actions taken merely to further an employer's substantive bargaining position in a particular contract negotiation. *Esmark, Inc. v. NLRB*, 887 F.2d 739, 748 (7th Cir. 1989). "Inherently destructive conduct is that conduct which has 'far reaching effects which would hinder future bargaining,' i.e., that conduct which 'creat[es] visible and continuing obstacles to the future exercise of employee rights.'" *Id.* (quoting *Portland Willamette Co. v. NLRB*, 534 F.2d 1331, 1334 (9th Cir.1976)). The two types of recognized inherently destructive conduct are actions distinguishing among workers based on participation (or lack of participation) in a protected activity, and those acts which do not divide the work force, but rather discourage collective bargaining by making it appear as a futile exercise in the eyes of employees. *Esmark*, 887 F.2d at 748–49.

In *Esmark*, the court found that the Board could permissibly find that a company's repudiation of a collective bargaining agreement and subsequent reopening under a new corporate name after a two-week hiatus in operations communicated to employees that collective bargaining was "a futile exercise." *Id.* at 749. "The NLRB could conclude that the calculated repudiation of the collective bargaining agreement and prompt institution of less favorable terms sends a signal to employees that despite their diligent efforts to organize and bargain collectively, their contract may be disregarded." *Id.* Similarly, in *NLRB v. Borg Warner Corp.*, 663 F.2d 666, 668 (6th Cir.1981), *cert. denied*, 457 U.S. 1105, 102 S.Ct. 2903, 73 L.Ed.2d 1313 (1982), this court held that an employer's attempt to avoid paying union wages by laying off employees rather than transferring them to a newly created subsidiary was inherently destructive behavior.

■ The Board found that Centra's actions were motivated by a desire to pay lower wages and to avoid its obligations under the "white paper" agreement between D & S and Local 964. Centra sought to evade its obligation as a joint employer to negotiate with the D & S employees over the decision to terminate the contract and the effects of that decision. Its actions in terminating its contract with D & S, withholding from the union relevant information, and seeking to avoid its obligations to bargain with Local 964 reasonably support the Board's findings that such behavior was inherently destructive to protected employee rights of collective bargaining. This case fits well within the extant case law construing the meaning of "inherently destructive" conduct under section 8(a)(3).

Centra does not contest the 8(a)(3) violation based on a review of this case law, but offers other arguments why the finding should not be enforced. First, it argues that the finding that its actions were inherently destructive to employee rights is illogical, as 26 persons hired by Cartage were also members of Local 964 prior to the transition. Therefore, employees were not rejected on the basis of their union activities and its actions cannot be said to patently discourage membership in Local 964. This argument, however, is misdirected as it focuses on the first prong of inherently destructive conduct, actions distinguished among workers based on participation (or lack of participation) in a protected activity, rather than the second prong, acts which do not divide the work force but discourage collective bargaining by making it appear as a futile exercise to employees. *See Esmark*, 887 F.2d at 748–49. For the reasons stated, we think the Board reasonably concluded that the Centra's actions made collective bargaining appear futile in the eyes of the members of Local 964, whose section 7 rights were ignored by the company.

The company's other argument is that there can be no section 8(a)(3) violation based on inherently destructive conduct without a concurrent violation of section 8(a)(5). *See Milwaukee Spring Div. of Illinois Coil Springs Co.*, 268 N.L.R.B. 601 (1984), *enforced*, 765 F.2d 175 (D.C.Cir. 1985). For the reasons stated, the finding that Centra violated section 8(a)(5) was supported by substantial evidence on the record as a whole. Thus, there is a concurrent section 8(a)(5) violation in this case,

and Centra's latter argument must fail as well.

■ With respect to the issue of antiunion animus, Centra contests the Board's determination that the company failed "to articulate a definite standard by which employees were evaluated" in the rehiring decision. Under the analysis set forth in *NLRB v. Wright Line*, 251 N.L.R.B. 1083 (1980), *enforced*, 662 F.2d 899 (1st Cir. 1981), *cert. denied*, 455 U.S. 989, 102 S.Ct. 1612, 71 L.Ed.2d 848 (1982), once the general counsel has made a *prima facie* showing of antiunion animus, i.e., that union activity was a "but for" cause of the disputed action, the employer must demonstrate that its actions would have been taken even in the absence of the union activity. Centra argues that it simply identified the best performers on the dock and hired them for its operations and that no regard was given to an employee's union activities. The company also claims that the Board's finding of antiunion animus, based on statements allegedly made by Cartage personnel that some of the D & S employees would not be hired back because of their involvement with Local 964, is "ludicrous." To support this claim, Centra points out that two former union committeemen were hired by Cartage and that at least two employees who had never participated in Local 964 activities were not hired. Taken together, the company claims that these facts prove that the layoffs and rehirings were made on the basis of work performance, not union activity.

■ We find substantial evidence to support the Board's determination that Centra failed to carry its burden under *Wright Line* of responding to the general counsel's *prima facie* showing of antiunion animus. First, Centra has not shown that it lacked an antiunion animus simply by citing the fact that some union adherents were rehired while some nonactivists were not. In *Nachman Corp. v. NLRB*, 337 F.2d 421, 424 (7th Cir.1964), the court held that "a discriminating motive, otherwise established, is not disproved by an employer's proof that it did not weed out all union adherents." Further, Centra offered no objective or definable criteria to support its decision as to rehirings. The purely subjective rationale offered by Centra permitted an inference of antiunion motivation. Finally, the Board relied on the statements attributed to various Centra personnel only as evidence relevant to the issue of the company's state of mind in rehiring certain former D & S employees and laying off others without any definable criteria. These statements were not considered dispositive by the Board but were used only as further proof of antiunion animus.

Substantial evidence on the record as a whole supports both the finding of antiunion animus and inherently destructive conduct by Centra. The determination that Centra violated sections 8(a)(1) and (3) is therefore upheld.

## IV.

For all of the foregoing reasons, we grant the NLRB's application for enforcement.