## NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

## GENERAL SECURITY SERVICES CORPORATION, Respondent.

No. 97–6240.

United States Court of Appeals, Sixth Circuit.

Argued Nov. 5, 1998.

Decided Dec. 10, 1998.

---

Robert A. Boonin (argued and briefed), James S. Rosenfeld (briefed), Butzel Long, Detroit, Michigan, for Respondent.

Sharon I. Block (argued and briefed), National Labor Relations Board, Office of the General Counsel, Washington, DC, Aileen A. Armstrong, Deputy Associate General Counsel, Charles P. Donnelly, Jr. (briefed), National Labor Relations Board, Appellate Court Branch, Washington, DC, for Petitioner.

Before: KEITH, KENNEDY, and NORRIS, Circuit Judges.

KENNEDY, J., delivered the opinion of the court, in which ALAN E. NORRIS, J., joined. KEITH, J. (p. 447), delivered a separate dissenting opinion.

## OPINION

KENNEDY, Circuit Judge.

The National Labor Relations Board ("Board") seeks enforcement of its decision and order finding that Respondent, General Security Services Corporation (the "Company" or "GSSC"), violated Sections 8(a)(1) and (3) of the National Labor Relations Act (the "Act") by refusing to reinstate two employees to their former positions because of union activity. For the reasons set forth below, we shall DENY enforcement of the Board's order.

## I. BACKGROUND

Respondent GSSC is a Minnesota corporation that provides security services to the United States Government, as well as to other entities. GSSC contracts to provide security services to the Department of Justice, United States Marshals Services ("USMS") within the Sixth Circuit Court of Appeals, including the Northern District of Ohio courthouses in Cleveland, Toledo, Youngstown, Akron, and Canton, Ohio. Under GSSC's contracts with the USMS, court security services must be provided by Court Security Officers ("CSOs"). CSOs serve as deputy U.S. Marshals, protecting the courthouse buildings and property, and judges, court personnel, witnesses, attorneys, and others who utilize the federal courthouses. Although GSSC actually employs the CSOs, each CSO's hiring process is strictly controlled by the USMS. GSSC offers jobs to those applicants whom it considers the best candidates, subject to final clearance by the USMS. Because the CSO must be a sworn Deputy U.S. Marshal, wear a government uniform, carry a government credential and a government weapon, and possess the authority to make arrests on behalf of the federal government, the federal government reserves the right to approve any candidates hired by GSSC as CSOs, and maintains sole control over the credentialing process. If for any reason the USMS withdraws a CSO's credentials, the CSO cannot continue to work under the contract at any federal courthouse. Among the means by which the USMS enforces its control over its credentials is the contractual right to order the removal of CSOs from working under its service contracts. Under the contract, GSSC must then notify the CSO of the removal order and of the CSO's right to file an appeal within ten days.

During 1995, Thomas F. Slader ("Slader") was a full-time CSO in the federal courthouse in Cleveland, and William J. Wright ("Wright") was a part-time CSO in Akron. In February 1995, Slader initiated an organizing campaign on behalf of the United Government Security Officers of America and urged his co-workers in the Northern District of Ohio to sign union authorization cards. In May 1995, the United Government Security Officers of America, Local 56 was certified by the Board as the collective bargaining representative for the CSOs within the Northern District of Ohio pursuant to a Board-conducted election. Following certification, Slader was elected president of Local 56. The union, which also represented CSOs in several other judicial districts, attempted to negotiate a collective bargaining agreement with GSSC over the summer months and the parties reached a tentative agreement. The agreement was not ratified and the union initiated strikes in various districts. The CSOs in the Northern District of Ohio commenced their strike on November 20, 1995. Slader organized picketing and handbilling in Cleveland, in which approximately 20 other CSOs participated. During the first week of the strike, Wright was the only picketer at the Akron courthouse. Wright did eventually encourage several other CSOs to join him.

On November 29, 1995, GSSC reached a new tentative agreement with the union and all strikers in Northern Ohio returned to work on December 1, 1995. On December 18, GSSC Vice President Andrew Pierucki ("Pierucki") received a letter from Deborah Skeldon, the USMS's contracting officer, ordering the immediate removal of Slader and Wright. The next day, Pierucki forwarded letters to Slader and Wright notifying them of the USMS's removal of their credentials, informed them of their right to appeal to the USMS, and notified them that the removal orders necessitated their termination as GSSC had no other contracts in the area to

which it could reassign them. Slader and Wright filed grievances with GSSC, but Pierucki told them that because the union and GSSC had not yet finalized a collective bargaining agreement, no grievance procedure existed by which to process them. Slader and Wright also sent appeals of their terminations to GSSC, which Pierucki then forwarded to the USMS on January 3, 1996. He included a cover letter to the effect that GSSC had received no information regarding the reasons for Slader and Wright's removal orders, but that should USMS provide the company with sufficient information to conduct its own evaluation, it would do so. Pierucki added that GSSC would not condone "any retaliation proscribed by the National Labor Relations Act."

In the meantime, GSSC filled the positions vacated by Slader and Wright. Under GSSC's contract with the USMS, GSSC was required to fill vacant CSO positions within 14 to 30 days or else pay liquidated damages. GSSC filled Wright's position in the Akron courthouse by reassigning CSO John D. Ryder ("Ryder"), who had a pending request to transfer from Cleveland to Akron. The transfer was approved in January, but did not take effect until March 1996 due to staffing shortages in Cleveland. On January 23, 1996, John D. Johnson ("Johnson") was hired to fill Ryder's Cleveland position. To fill Slader's full-time position in Cleveland, GSSC reassigned CSO Ronald C. Flowers ("Flowers"). In turn, GSSC filled Flowers' newly-vacated position on January 10, 1996 by hiring Thomas R. Davis ("Davis"). Al-

though GSSC filed with the Marshal's Service all paperwork required for obtaining the necessary credentials for Davis and Johnson by February 1, 1996, these two new hires were not actually cleared by the USMS until early March 1996.

On February 8, 1996, USMS contracting officer Deborah Skeldon wrote Pierucki a letter that stated, "After conducting an independent review of the matter and taking into consideration Executive Order 12954 (March 8, 1995)[1] the Marshals Service would not object to Mr. Slader and Mr. Wright's reemployment as CSOs in the Northern District of Ohio." On February 22, 1996, Pierucki wrote back to the USMS to request clarification of its decision. In his letter, Pierucki expressed concern that the USMS's recission of the removal orders would strain GSSC's relationship with the Union, and confusion as to what the USMS meant by its statement that it "will not object to Mr. Slader and Mr. Wright's reemployment."[2] He asked whether, in light of the fact that GSSC had already hired replacements, the USMS intended that Slader and Wright should be re-hired as new employees or reinstated to their former positions.[3]

The USMS did not respond to Pierucki's inquiry until March 25, 1996, in a letter from Deborah C. Westbrook, the USMS General Counsel. The letter tersely stated that "[t]he USMS requested that GSSC remove Mr. Slader and Mr. Wright," but "did not request that GSSC dismiss these individuals from their employment." The letter offered no clarification as to whether or how Slader

---

1. The Executive Order authorized the Secretary of Labor to disqualify from federal contracts any employers who hire permanent replacement workers during a lawful strike. The order declares in pertinent part:

> It is the policy of the executive branch in procuring goods and services that, to ensure the economical and efficient administration and completion of Federal Government contracts, contracting agencies shall not contract with employers that permanently replace lawfully striking employees.

Exec. Order No. 12,594, 60 Fed.Reg. 13,023 (1995). The Executive Order was set aside on February 2, 1996 by the D.C. Circuit in *Chamber of Commerce v. Reich*, 74 F.3d 1322 (D.C.Cir. 1996).

2. Pierucki also questioned why the USMS had consulted Executive Order 12,594 in reviewing its own decision to issue a removal order, as the Executive Order had been set aside, *see* n. 1, *supra*, and as its provisions appeared to apply only to contractors, not to the USMS.

3. Pierucki explained,

> We have conditionally hired some replacement employees and have promoted others to fill the positions vacated as a result of your direction to remove these CSOs. Is your letter a recission of the removal, i.e. are we to give preferential rights to these CSOs? Also, if reemployed, are they to be paid based on their prior service, or as new employees? We respectfully request a more clear course of action be made for us.

and Wright should be reinstated. GSSC then rehired both Slader and Wright following its usual hiring procedures for new hires and former CSOs seeking reemployment. In his testimony before the ALJ, Pierucki explained that former CSOs are

> welcome to apply anywhere and as long as they were in good standing and left the company in good standing, and were not removed for misconduct or some such reason, or by the Marshals' Service because they would not let them come back on any contract, their name goes on file and they go on the waiting list. If and when an opening occurs, we rehire them.

The company first rehired Slader, and then Wright, into the next available positions. In the meantime, unfair labor practice charges had been filed against the company. A complaint was issued on March 27, 1996 alleging that GSSC violated Sections 8(a)(1) and (3) of the Act by failing to recall Slader and Wright to their former positions in retaliation for their union activity.[4]

On November 26, 1996, the Administrative Law Judge (the "ALJ") issued a recommended decision and order in which he concluded that GSSC violated Sections 8(a)(1) and (3) of the Act by refusing to reinstate Slader and Wright to their former positions of employment as CSOs. The Board issued a decision and order on April 25, 1997 affirming the ALJ's findings and conclusions and adopting his recommended order.

## II. STANDARD OF REVIEW

■ In considering the Company's petition for review, the Board's "findings of fact, as well as its application of law to fact, may not be disturbed where substantial evidence on the record taken as a whole supports the Board's findings and conclusions." *N.L.R.B. v. Vemco*, 989 F.2d 1468, 1473 (6th Cir.1993)(citing *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 488, 71 S.Ct. 456, 95 L.Ed. 456 (1951); *Turnbull Cone Baking Co. v. N.L.R.B.*, 778 F.2d 292, 295 (6th Cir.1985);

29 U.S.C. § 160(e), (f)). Substantial evidence encompasses "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938); *see N.L.R.B. v. Thompson Products*, 97 F.2d 13, 15 (6th Cir.1938)(substantial evidence "means that the one weighing the evidence takes into consideration all the facts presented to him and all reasonable inferences, deductions and conclusions to be drawn therefrom and, considering them in their entirety and relation to each other, arrives at a fixed conviction.").

■ The appellate court must also accord deference to the Board's credibility findings and to inferences drawn from the evidence on the record. This court has observed that "[i]n reviewing the credibility findings and the inferences drawn by the Board from the evidence, the test for a reviewing court is whether the conclusions are reasonable in light of the proven facts." *N.L.R.B. v. Kentucky May Coal Co.*, 89 F.3d 1235, 1242 (6th Cir.1996)(citing *N.L.R.B. v. Paschall Truck Lines, Inc.*, 469 F.2d 74, 76 (6th Cir.1972); *see N.L.R.B. v. Fluor Daniel Inc.*, 102 F.3d 818, 837 (6th Cir.1996)(The Board's credibility determinations will be upheld as long as they have a rational basis)).

## III. ANALYSIS

■ Section 8(a)(1) of the National Labor Relations Act makes it an unfair labor practice to interfere with, restrain, or coerce employees in the exercise of their right to self-organization under Section 7 of the Act. 29 U.S.C. § 158(a)(1). Section 8(a)(3) makes it an unfair labor practice for an employer to "discriminate in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization." 29 U.S.C. § 158(a)(3). To decide cases involving charges of discriminatory employment actions motivated by an employer's anti-union animus, we apply the standard set forth

---

**4.** The complaint also alleged discrimination against the employees in violation of Sections 8(a)(1) and (4) of the Act for filing charges or giving testimony, and alleged that agents of GSSC threatened to terminate Wright if he participated in a strike. The ALJ found that the charge alleging threats of dismissal was without merit and determined in his recommended decision and order that it was unnecessary to resolve the discrimination charge.

in *Wright Line,* 251 N.L.R.B. 1083 (1980), and approved by the Supreme Court in *N.L.R.B. v. Transportation Management Corp.* 462 U.S. 393, 394–95, 103 S.Ct. 2469, 76 L.Ed.2d 667 (1983). To state a prima facie case of discrimination, the General Counsel must persuasively establish that the evidence supports an inference that protected conduct was a motivating factor in the employer's decision. Once the General Counsel states a prima facie case, the burden shifts to the employer to prove by a preponderance of the evidence that it would have taken the same action even in the absence of protected conduct. *Transportation Management Corp.,* 462 U.S. at 394–95, 103 S.Ct. 2469; *N.L.R.B. v. Centra, Inc.,* 954 F.2d 366, 374 (6th Cir. 1992); *Roadway Express, Inc. v. N.L.R.B.,* 831 F.2d 1285, 1288 (6th Cir.1987).

## A. Proceedings Below

Slader and Wright's original discharge is not at issue in this appeal. Rather, at issue is GSSC's decision regarding how best to handle their employment situation *after* their discharge. Relying almost exclusively on Pierucki's February 22 letter and his testimony as an adverse witness for the General Counsel, the ALJ determined that anti-union animus was a motivating factor in GSSC's decision to *reemploy* Slader and Wright into new vacancies rather than *reinstate* them to their former positions.

According to the ALJ, GSSC's anti-union animus first became evident in Pierucki's February 22 letter to the USMS, which questioned the USMS's recission of the removal order. The ALJ focused primarily upon the first substantive paragraph of the February 22 letter, in which Pierucki wrote:

> We are confused on the substance of your letter and need clarifications as to the direction we are to take. While we are not privy to what "independent review" has taken place regarding this matter, we have serious concerns that the seeming reversal of the decision to order removal will be construed as improper actions having been taken by GSSC and/or USMS, and thereby not only inadvertently encourages the union's effort to impact the court security program, but also encourages the union to

second guess both GSSC (which it apparently sees as its job) and the USMS (a tactic which we have been trying to discourage)! This decision may, therefore, have a dramatic effect on the ability of contractors to be able to constructively handle labor relations in the future.

The ALJ described the February 22 letter as a "drastic and remarkable change in tone and concern" from Pierucki's January 3 letter to the USMS, in which he conveyed to the USMS that GSSC would not condone any infringement by the USMS of its employees' rights under the National Labor Relations Act.

The ALJ also relied upon numerous excerpts from Pierucki's trial testimony as an adverse witness for the General Counsel to buttress his finding of anti-union animus. According to the ALJ, Pierucki's testimony revealed that when he learned of the USMS's decision to reverse its removal orders and confronted the choice between hiring Slader and Wright into new positions or reinstating them, at the heart of his concern was the fate of GSSC's emergent collective bargaining agreement. In describing the nexus between the USMS's recission of the removal order and Pierucki's own relationship with the union, Pierucki testified that he had talked with the International Union "time after time, meeting after meeting, tentative agreement after tentative agreement to make them understand that we are the employer [and that] they should be dealing with us," and added that the union bypassed GSSC and "tried to use ... political methods to get the people reinstated." The ALJ also relied on Pierucki's testimony in explaining the purpose of his February 22 letter. Pierucki testified that he was concerned about the company's leverage in the ongoing collective bargaining:

> I was very concerned about the ramifications of this particular union that I am trying to get an agreement with. Even though there was a strike, we have relatively good relations with these folks ... All of a sudden when the Marshal's Service does something, they set up an arrangement, a relationship with the Marshal's Service. I was concerned that both in this instance and in the future that once that

relationship was established, I become nothing more than a payroll service, and that is not what I am contracted to do. I am supposed to be in charge of the employees, finding qualified applicants and bringing them in, disciplining them, if necessary, guiding them, motivating them, and keeping them interested so that I can perform my contract. It gets real fuzzy between the union thinking that the contract I have with the government is their contract. That is my contract and my company's contract. There is another contract between my company and the union. My opinion, or my philosophy is never the twain shall meet.

Thus, the ALJ did not conclude that GSSC's anti-union animus arose directly from Slader and Wright's union membership or participation in union activities. Indeed, they had been working from December 1, 1995, when the strike ended, until the Marshal's Service withdrew their credentials on December 18. Rather, his assessment of Pierucki's February 22 letter and trial testimony led him in a roundabout manner to conclude that "[Pierucki] did indeed harbor animus toward the Union *because of its efforts on behalf of the dischargees* to obtain a reversal of the removal order, and *implicitly* animus toward [Slader and Wright,] the precipitators of such action." (emphasis added).

The ALJ then discredited Pierucki's reasons for choosing reemployment in lieu of reinstatement as pretextual. He focused on Pierucki's professed concern over what to tell the new employees to whom he had already offered replacement positions, and one of whom had entered on his new duties. According to Pierucki, he was unsure as to whether USMS was ordering him to re-employ Slader and Wright and to 'kick the other guys out.' He testified, "Maybe they had quit other jobs to come on board and I'd feel pretty bad on behalf of my company, to tell them [not] to come on board." The ALJ

discounted Pierucki's concerns on grounds that "he offered no explanation as to why Pierucki did not exercise other options pending the USMS review of the dischargees' appeals." The ALJ determined that offers of employment to Davis and Johnson were conditional pending clearance from the USMS and neither individual had yet received clearance on February 8, when Pierucki received the USMS's recission of its removal order and permitting reemployment. The ALJ held that anti-union animus motivated Pierucki's decision because GSSC presented "no evidence as to the actual employment status of Davis and Johnson on February 8, i.e. whether they were unemployed, retired or employed elsewhere pending USMS clearance;" GSSC presented "no evidence of the necessity to formally promote Flowers to Slader's full-time position in January prior to receiving a response form the USMS to Pierucki's offer of input into the review;" GSSC presented "no evidence that Davis and Johnson possessed any particular skills, experience or urgent needs that warranted Pierucki's decision to offer them immediate employment;" and most important, GSSC presented "no explanation for the failure to consider the obvious option of suspending [Slader and Wright] pending the USMS appeal review and filling their work hours with expanded work of the other part-time CSOs ... [and presented] no evidence that such distribution of work was impossible or otherwise inconvenient."

The ALJ therefore concluded that the company's decision not to reinstate Slader and Wright "was in major part unlawfully motivated." In essence, the company's failure to arrest the process of replacing Slader and Wright upon receipt of the USMS's February 8 letter was attributable to Pierucki's frustration with the union for attempting to go over his head to negotiate with the USMS directly. According to the ALJ, this frustration was unlawful anti-union animus.[5] He

---

5. There is no evidence that Pierucki harbored anti-union animus directly attributable to Slader and Wright's union organizing or strike activity. Though Pierucki was aware that Slader had been elected President of Local 56, he had no other information about either Slader's or Wright's personal union activities. The company took no

action against either CSO during the November 1995 strike and they both returned to work on December 1, 1995 without incident. Pierucki never discovered what Slader and Wright might have done, specifically, to prompt the Marshal's Service's removal orders. At best, Pierucki speculated that they must have "done something

concluded that the causal relationship between Pierucki's anti-union animus and his failure to reinstate the CSOs was proven by GSSC's failure to explain why it couldn't have taken alternative action. The ALJ added, "Based upon Pierucki's inconsistent, evasive and self-destructive testimony, I would further conclude that the other reasons proffered were pretextual and that this was not a mixed motivations decision." The ALJ also offered an alternative conclusion: even assuming that the General Counsel had proven only partial unlawful motivation, the company "failed to meet its *Wright Line* burden with a preponderance of the evidence that the same action would have taken place even in the absence of the protected conduct."

The Board adopted the ALJ's recommended order on April 25, 1997. A brief footnote, however, revised the ALJ's findings and conclusions. The footnote recognized that the ALJ had misallocated the burden of proof. Rather than rejecting the ALJ's findings, the Board explained,

In adopting the judge's decision, we do not rely on his characterization of the Respondent's burden of proof in rebutting the General Counsel's prima facie case with respect to the Respondent's failure to reinstate court security officers Slader and Wright as requiring coherent, compelling, and convincing reasons. Rather, we find that the Respondent failed to establish its rebuttal by a preponderance of the evidence, as the judge promptly and correctly noted previously.

In sum, the Board held that, even assuming the General Counsel had proven only partial unlawful motivation, GSSC then failed to rebut the General Counsel's prima facie case because it did not prove by a preponderance of the evidence that the company would have taken the same action with respect to Slader and Wright in the absence of protected conduct. On appeal, we address this narrow issue alone.

## B. Discussion

The company contends that, after USMS reversed its removal orders, it would have taken precisely the same action with respect to Slader and Wright as it would have taken in the absence of protected conduct. To prevail, the company must prove its contention by a preponderance of the evidence. *See N.L.R.B. v. Centra, Inc.*, 954 F.2d at 374; *Roadway Express, Inc. v. N.L.R.B.*, 831 F.2d at 1288.

As a threshold matter, it is worth reiterating that the "protected conduct" at issue in this case has little to do with Slader and Wright's strike activity or union membership standing alone. Although both parties have speculated that the CSOs' union organizing or strike activity may have motivated the USMS to request their removal from the contract in the first place, their initial removal is not contested. Rather, the "protected conduct" here consists of the union's efforts to bypass the company and appeal Slader and Wright's termination directly to the USMS.[6] According to the ALJ, it was this conduct by the union that irritated Pierucki and prompted him to return Slader and Wright to the new hire pool instead of reinstating them to their former positions.

To establish its rebuttal, the company must prove by a preponderance of the evidence that had the union *not* intervened directly with the USMS, the company would have nonetheless chosen to rehire Slader and Wright into new vacancies in lieu of reinstating them to their former positions. We disagree with the Board that GSSC failed to establish its rebuttal by a preponderance of

wrong" or "upset someone on a local basis," as there could be no other rational explanation for the Marshal's Service ordering their removal.

6. The ALJ concluded that it was unnecessary to impute anti-union animus to GSSC because of statements by managers to Slader and Wright while they were actually engaged in organizing and strike activity because:

Pierucki's own testimony established not only his animus but revealed that at least "the ma-

jor reason," if not the sole reason, for his decision not to reinstate them was because of the Union's activities on their behalf, which they instigated and supported by their appeals, their union membership and strike activities and Slader's union presidency. An adverse employment decision based upon a union's activities on behalf of adversely affected employees manifestly discouraged union activities and union membership.

the evidence. The record does not contain evidence sufficiently substantial to support the Board's conclusion that the company failed to meet its *Wright Line* burden.

■ In reviewing the Board's determination, we review the record "as a whole." *See Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 491, 71 S.Ct. 456, 95 L.Ed. 456 (1951). The "substantial evidence" standard does not leave factual questions wholly to the Board; to the contrary, it requires us to take account of the evidence that undermines the Board's conclusions. *Caremore Inc., v. N.L.R.B.*, 129 F.3d 365, 369 (1997) (citing *Hickman Harbor Svc. v. N.L.R.B.*, 739 F.2d 214, 219 (6th Cir.1984)). The decision in the instant case also turns in no small part upon the credibility determinations made by the ALJ. Whether or not the company discriminated against Slader and Wright by rehiring them depends almost entirely on whether the ALJ chose to believe or discredit Pierucki's characterization of his priorities and the sincerity of his reasons for filling their vacancies in the manner in which he did. Two premises underlie the Board's determination that the company failed to show that it would have taken the same action in the absence of protected conduct. The determination first rests on the premise that the company could—and should—have exercised other staffing options to fill Slader and Wright's positions pending their appeal. The determination also rests on the premise that the company should have known as early as February 8, 1996 that it could reinstate Slader and Wright to their former positions, and that it would have done so immediately had it not been for the union's interference.

Among the facts critical to the company's rebuttal with regard to the action it would have taken pending Slader and Wright's appeal is the existence of a liquidated damages clause in GSSC's contract to provide court security officers to the USMS. Under this clause, the company was obliged pay liquidated damages to the USMS if it failed to fill any staffing vacancy within 30 days. The company's obligation could be satisfied either by hiring a new CSO into the vacancy, transferring an existing CSO into the vacancy, or increasing the work hours of part-time employees. When Pierucki received the removal orders in December 1995, he had just 30 days in which to fill their positions. He satisfied this obligation by reassigning two existing CSOs. In turn, he filled the vacancies resulting from reassignment by hiring replacements from outside. The ALJ concluded simply that, because Pierucki *could* have satisfied his obligations by indefinitely expanding the work hours of part-time or full-time CSOs until such time as the USMS responded to Slader and Wright's appeal of their termination, he *should* have followed this course of action. The existence of an alternative therefore permitted the inference that the company would have pursued that alternative had the union not taken their appeal directly to the USMS.

Had the existence of an alternative been the only factor relevant to Pierucki's decision, the ALJ's determination would have to be affirmed. Pierucki did not, however, make his decision in a vacuum. By basing his decision only on the existence of an alternative, the ALJ failed to address the "big picture." The record supports that at the time the company was required to decide how to fill Slader and Wright's vacancies, it was subject to additional influences and circumstances that the ALJ failed to address. In addition to avoiding operation of the liquidated damages clause, Pierucki testified that he took into account that the USMS had never before reversed a removal order. There is nothing in the record to suggest that this was not true or that Pierucki's concern regarding this matter was insincere. Even if the union had pursued its appeals through the company rather than dealing directly with the USMS, the company had no reason to expect that it should treat these removal orders as any less final than those it had received in the past. Another integrally related consideration is Pierucki's testimony that the Cleveland courthouse was experiencing a staffing shortage. While the possibility of expanding the work hours of part-time and full-time CSOs was theoretically possible, the record demonstrates that, in reality, the staffing situation was less malleable than the ALJ speculated. It is worth reiterating that these concerns are interrelated. The viability of merely suspending Slader and Wright

and expanding the work hours of other CSOs pending appeal must be assessed in light of the Marshal's Service's consistent history of not rescinding removal orders, the company's contractual obligation to fill vacancies within 30 days, and the Cleveland staffing shortage. Moreover, none of these particulars would have differed in the absence of protected conduct. Reviewing the record as a whole, we cannot agree with the Board that the company failed to establish by a preponderance of the evidence that it would have taken the same action pending Slader and Wright's appeal.

Another important premise upon which the ALJ and Board relied is that when Pierucki received the USMS's February 8 letter rescinding Slader and Wright's removal orders, the company should have reinstated the two CSOs to their former positions, and would have done so had it not been for the union's efforts to intervene with the USMS on Slader and Wright's behalf. We are satisfied that the company adduced sufficient credible evidence to prove that it would have taken the same action in the absence of any such direct "lobbying" efforts by the union.

First, the record is quite clear that the company had always followed the same procedure with respect to rehiring former CSOs who wanted to return to work: if they had left the company in good standing and were permitted by the USMS to return to the contract, they would be put into the same pool as new applicants and rehired when the next opening occurred. The company followed this procedure to the letter with Slader and Wright. Pierucki also testified that he frequently rehired former CSOs and that the company had *consistently* followed this

procedure—this particular hiring process had never been terminated to "make room for an employee seeking to be rehired." The Board introduced no evidence to suggest that the process had been inconsistently applied or that Pierucki inaccurately described the procedure.

Second, even after the union's supposed efforts to procure reinstatement by dealing directly with the USMS, the USMS's instructions to GSSC were simply to "reemploy" Slader and Wright. After their termination, both Slader and Wright had submitted formal written grievances to Pierucki, who forwarded them with a cover letter to the USMS. Both CSOs explicitly requested "immediate reinstatement, full back pay, and no loss of benefits." In its February 8, 1996 letter to Pierucki, the USMS acknowledged that it had received correspondence from both Slader and Wright referencing their termination.[7] While the USMS's letter easily could have directed that Slader and Wright be reinstated with full back pay and no loss of benefits, as they had requested, the USMS instead indicated that it would not object to their "re-employment." In his February 22 response to the USMS, Pierucki requested clarification. He explained that the company had hired replacements to fill Slader and Wright's vacancies, and asked whether the USMS intended that the company give Slader and Wright "preferential rights" and whether they should be paid based on their prior service or as new employees. Over a full month passed before the USMS finally replied on March 25, 1996.[8] Even then, the USMS neglected to respond to the specific questions posed in Pierucki's

---

7. It is unclear whether the "correspondence" from Slader and Wright mentioned in the USMS's letter included only the letters forwarded by Pierucki or also subsequent communication directly with the USMS.

8. Though the ALJ emphasized that GSSC could have easily restored Slader and Wright to their former positions because neither the reassigned employees nor the replacement hires were "committed to anything during the pendency of USMS approval," his opinion overlooks the fact that CSO Flowers was reassigned to Slader's position as of January 22, 1996, more than two weeks before Pierucki received the reversal of Slader's removal order. Although CSO Ryder was unable

to start immediately upon reassignment due to the Cleveland staffing shortage, he moved into the position on March 14, 1996, at which point Pierucki had still not received any reply from the USMS as to what it meant by "reemployment" of Slader and Wright. Moreover, Pierucki testified that Jim Vissar, President of the International Union, had been involved in the decision to transfer Ryder from Cleveland into Wright's position. Both Davis and Johnson, who had been offered positions by mid-January, received their final clearance in early March and started work prior to Pierucki's receipt of the USMS's March 25, 1996 letter.

February 22 letter. Though the USMS was squarely confronted with a second opportunity to explain that Slader and Wright should be reinstated, it obscurely replied, "The USMS requested that GSSC remove Mr. Slader and Mr. Wright ... The USMS did not request that GSSC dismiss these individuals from their employment." Without input from the USMS as to whether Slader and Wright should be reinstated, legitimate economic concerns counseled that the company should not deviate from its standard rehiring procedures.

The company offered evidence that reinstating, rather than rehiring Slader and Wright into new openings would have adversely affected GSSC's contract with the USMS. Pierucki testified that the question whether to bring Slader and Wright back on board into new vacancies or as reinstated employees was relevant because of the different rates of pay for each type of hire and how their salaries might impact upon his contractual obligation to USMS. According to Pierucki's testimony, "[t]he contract is subject to price revision in the option period. What the employees are being paid in wages and benefits has a direct relationship to what the price is going to be." He was concerned that the option period was "coming up on the horizon" and that reinstating the CSOs to their former positions after replacement hiring had been conducted in accordance with the rate of pay allowable under the contract would result in GSSC charging the government the wrong price. The ALJ wrote off Pierucki's testimony as "unconvincing" and suggested in his opinion that Pierucki only articulated concern over the potential economic impact on the contract upon "some prodding" by his counsel and after a "memory 'black out.'" It is clear from the record, however, that Pierucki suffered neither any real nor feigned lapse in memory and that the only brief difficulty in eliciting testimony regarding the economic impact of rate of pay on the contract was due to the respondent's attorney's temporary inability to fashion a sufficiently precise question to satisfy the objections of the opposing counsel. Nothing in the record rationally supports that Pierucki's professed pricing concerns were unfounded or insincere.

The record convinces us that the variables counseling GSSC's decision, including past practice, the customer's instructions, and the rate of pay allowable under GSSC's contract with the USMS were legitimate, nondiscriminatory factors and there is no evidence that either these factors or the degree of their influence would have differed in the absence of protected conduct.

## IV.  CONCLUSION

Having carefully considered the record on appeal, the briefs of the parties, the arguments of counsel, and the applicable law, we DENY the Board's application for enforcement.

KEITH, Circuit Judge, dissenting.

I respectfully dissent from the decision reached by the court. Based on Mr. Pierucki's testimony and the letter he wrote dated February 22, 1996, I agree with the conclusion of the Board and the Administrative Law Judge that there is substantial evidence that General Security Services Corporation violated Sections 8(a)(1) and (3) of the Act by refusing to reinstate CSO's Slader and Wright to their former positions of employment.